April D. PIATT, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.

No. 13–CV–6436 EAW.

United States District Court, W.D. New York.

Signed Jan. 22, 2015.

Elizabeth Ann Haungs, Justin M. Goldstein, Kenneth R. Hiller, Law Offices of Kenneth Hiller, Amherst, NY, for Plaintiff.

Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, Sandra M. Grossfeld, Social Security Administration, New York, NY, for Defendant.

### DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

Plaintiff April D. Piatt ("Plaintiff") brings this action pursuant to 42 U.S.C.

§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for disability insurance benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Yvette N. Diamond was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 12, 14). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings (Dkt. 14), is granted, and Plaintiff's motion (Dkt. 12) is denied. Plaintiff's complaint is dismissed with prejudice.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On December 8, 2010, Plaintiff protectively filed an application for disability insurance benefits. (Administrative Transcript (hereinafter "Tr.") 168–78). In her application, Plaintiff alleged a disability onset date of December 31, 1994. (Tr. 172). Plaintiff later amended her alleged onset date to December 8, 2010. (Tr. 22). Plaintiff alleged the following disabilities: depression, anxiety, and back problems. (Tr. 172). On March 16, 2011, the Commissioner denied Plaintiff's application. (Tr. 82). Plaintiff timely filed a request for a hearing before an Administrative Law Judge. (Tr. 86–87).

On May 29, 2012, Plaintiff, represented by counsel, testified at a video hearing before ALJ Diamond. (Tr. 21–51). Vocational Expert ("VE") Tania J. Shullo also appeared and testified. (Tr. 52–58). On June 8, 2012, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Dkt. 1–1 at 5–13).

On June 21, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Dkt. 1–2 at 2–5). On August 16, 2013, Plaintiff filed this civil action appealing the final decision of the Commissioner. (Dkt. 1).

### B. The Non–Medical Evidence

At the time of the hearing, Plaintiff was a 41 year old female educated through the tenth grade. (Tr. 26–27). Plaintiff had previous work experience as a book binder, cashier, and nurse's aide. (Tr. 28, 173).

### 1. Plaintiff's Testimony

Plaintiff testified that she has three children, and lived with her nineteen year old son in a two-floor apartment. (Tr. 25–26). Plaintiff received food stamps and rent subsidy assistance from the state. (Tr. 27–28). She last worked as a bookbinder approximately fifteen years before the hearing. (Tr. 28). She stopped working as a bookbinder because "it was too much" for her back to stand all day. (Id.). Plaintiff testified that she did not search for another job at that time because she was in a relationship and was taken care of by her significant other. (Id.).

Plaintiff stated that she was unable to work because of her hands, back, and the fact that she was "not good with crowds or lots of people." (Tr. 29). She could walk for one to two blocks before needing to take a break. (Tr. 45). She could stand for about 15 minutes before needing to sit. (Id.). Her left hand caused her more pain than her right, but both of her hands would go "numb" and cause her to drop things. (Tr. 46). She stated that she

could stay on task for about ten minutes, but could sit and watch a thirty minute television show. (Tr. 49).

Plaintiff testified that she was taking Ibuprofen for her back pain, and had not seen a specialist for her back pain. (Tr. 30, 33). She saw her primary care physician every six months, her psychiatrist every three months, and her therapist every other week. (Tr. 29–31). Plaintiff indicated that she was on psychotropic medications for her depression. (Tr. 30). Plaintiff stated that her medication made her drowsy, and made it difficult for her to get going in the morning. (Tr. 38–39). Although her medical records indicated prior cocaine and marijuana use, Plaintiff testified that she no longer used these substances. (Tr. 33).

Plaintiff testified that she had three young grandchildren and that she enjoyed spending time with them, but that she was limited because she was unable to pick them up. (Tr. 35).

Plaintiff stated that she had a hard time being around people who were not her family or friends because she was "not a people person" and would stay to herself most of the time. (Tr. 43). Plaintiff indicated that she spent most of her days lying on the couch to alleviate her back pain. (Tr. 42). Plaintiff testified that she cried a lot and would eat or pray to cope with her feelings. (Tr. 43–44).

Plaintiff stated that she was able to cook, clean, and go grocery shopping, but that her son did the vacuuming and dusting. (Tr. 36). She would occasionally ride the bus or take a ride from a relative to get to the store or to religious services. (Tr. 37–38).

## 2. Vocational Expert's Testimony

At the hearing, the ALJ presented VE Shullo with a series of hypothetical questions. (Tr. 52–58). First, the VE was asked to consider someone of Plaintiff's age, education, and experience who had no exertional limitations and could:

perform simple and complex tasks, low stressed work defined as occasional decision making and occasional changes in work setting and occasional contact with supervisors, co-workers, and the public.

(Tr. 52).

The VE testified that a hypothetical individual with these abilities and restrictions would be able to perform occupations that existed in significant numbers in the national economy, including machine feeder, hand packager, and sorter. (Tr. 52–53).

The ALJ then asked the VE to consider the additional limitations of a person limited to simple, routine tasks, unable to work at a production rate pace that could have no in-person contact with the public. (Tr. 53). The VE testified that such an individual could perform the same three representative positions. (Id.).

The ALJ asked the VE to determine whether there were any jobs in the national economy for an individual who was further limited insofar as the individual could stand for six out of eight hours, sit for two out of eight hours, lift or carry 20 pounds occasionally, 10 pounds frequently, occasionally push or pull, occasionally climb, balance, stoop, kneel, crouch, crawl, and climb ladders. (Tr. 54). The VE determined that such an individual could perform the positions of sorter, cleaner, and machine feeder. (Id.).

The VE further stated that a person who was additionally limited insofar as he or she could stand or walk four out of eight hours, sit for four out of eight hours, and required a sit/stand option, could perform the jobs of sorter, marker, or small products assembler. (Tr. 55). If this individual could lift less than ten pounds and only do occasional handling with the left

non-dominant hand, such an individual could work at the sedentary level as a surveillance system monitor, addresser, or sorter. (Tr. 55–56).

## C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

Pre-admission screening notes dated February 19, 2010, by Charlene Reeves, a mental health counselor from Behavioral Health Network, stated that Plaintiff reported experiencing stress due to the recent death of her mother and living with her daughter. (Tr. 272). Plaintiff reported a history of childhood, domestic, and substance abuse. (*Id.*). Plaintiff experienced paranoia and reported getting pain pills from a friend and prescription pain medications on the street. (*Id.*). Her affect was flat and her mood showed depression and anxiety. (Tr. 273). Plaintiff reported that she had recently been to the Rochester General Hospital emergency department for feeling "stressed out." (Tr. 272). Plaintiff was well groomed and cooperative, her thought process was organized, her insight and judgment were fair, and her short and long-term memory appeared to be intact. (*Id.*). Dr. Reeves diagnosed Plaintiff with adjustment disorder, alcohol and cannabis abuse, and chronic back pain. (*Id.*). Plaintiff was assigned to one-on-one therapy with Laura Masceri, LMSW. (*Id.*).

On February 25, 2010, Ms. Masceri reported that Plaintiff appeared well groomed with guarded but appropriate behavior, speech, and logical thought processes. (Tr. 221). Plaintiff was fully oriented with memory intact and judgment appropriate. (*Id.*). Plaintiff's mood was depressed, and Plaintiff displayed low energy. (*Id.*). Plaintiff reported stress due to homelessness, and was having a difficult time coping with her mother's death a year before. (*Id.*).

On March 8, 2010, Ms. Masceri noted that Plaintiff's mental status examination was essentially the same. (Tr. 276). Plaintiff reported paranoia, difficulty sleeping, and chronic pain. (Tr. 275). Ms. Masceri indicated that Plaintiff did not have the life skills to manage her symptoms of grief over the death of her mother, and stated that Plaintiff needed to work on her grief process and concrete objectives to assist her with life skills and obtaining employment. (Tr. 276). Ms. Masceri diagnosed Plaintiff with adjustment disorder, with mixed emotional features, alcohol and cannabis abuse, and chronic back pain. (Tr. 277). Plaintiffs prognosis was fair. (*Id.*).

On April 6, 2010, Dr. Muhammad Cheema from Genesee Mental Health Center performed a medication check on Plaintiff. (Tr. 223). Plaintiff denied using street drugs or alcohol. (*Id.*). Plaintiff appeared alert and fully oriented, although she showed depression and anxiety and reported sleep difficulties. (*Id.*). Dr. Cheema recommended a trial of Lexapro and Trazodone for Plaintiff's depressive disorder. (*Id.*).

On May 5, 2010, Plaintiff indicated to Ms. Masceri that she was drinking to cope with lack of sleep and feelings of sadness. (Tr. 289). Plaintiff noted that she had attended many funerals in the past year. (*Id.*).

Plaintiff reported on May 13, 2010, that she was unable to get her medications filled and had trouble sleeping and managing anxiety. (Tr. 305).

Plaintiff visited Ms. Masceri on May 19, 2010, and appeared anxious, but otherwise normal. (Tr. 293). Plaintiff indicated motivation due to her son being in foster care. (*Id.*).

On May 27, 2010, Ms. Masceri noted that Plaintiff's behavior had regressed, although Plaintiff was fully oriented, and her affect and judgment were appropriate. (Tr. 231–32). Plaintiff displayed symptoms of distractibility, low mood, low energy, and difficulty sleeping. (Tr. 231).

Ms. Masceri noted that Plaintiff appeared drowsy and guarded on June 7, 2010, and had continued to drink. (Tr. 297). Plaintiff was late for her June 21, 2010 appointment that was rescheduled for June 29, 2010, and Plaintiff did not show up for the rescheduled time. (Tr. 311).

On July 1, 2010, Ms. Masceri noted that Plaintiff had obtained her own apartment and that they had discussed Plaintiff's increased independence and reviewed her coping skills. (Tr. 313).

On July 15, 2010, Plaintiff continued therapy with Ms. Masceri, who noted that Plaintiff was having difficulty managing anxiety, restlessness, and lack of focus, including anxiety around crowds of people. (Tr. 315).

Plaintiff's dosage of Trazadone was increased on July 16, 2010, by registered certified nurse Matthew Avery, to help Plaintiff sleep. (Tr. 317).

On July 20, 2010, Ms. Masceri stated that Plaintiff was responding well and could be seen every two-to-three weeks instead of every week. (Tr. 316). Plaintiffs mental examination was normal. (Tr. 317).

On August 13, 2010, Plaintiff visited Dr. Lewis Mehl–Madrona of Genesee Mental Health, who indicated that Plaintiff was doing well and instructed Plaintiff to decrease her Trazodone dosage. (Tr. 324).

Ms. Masceri reported on August 23, 2010, that Plaintiff was fidgety, had a guarded attitude, an anxious mood, and displayed diminished insight. (Tr. 325). Plaintiff did not show up for her appointments on August 30, 2010, September 13, 2010, or September 29, 2010. (Tr. 327, 329, 331). At her October 4, 2010 appointment, Plaintiff appeared agitated and fidgety. (Tr. 333).

On October 11, 2010, Dr. Mehl–Madrona performed a mental status examination and found no abnormalities. (Tr. 336). Plaintiff did not appear for her appointments on October 18, 2010, November 15, 2010, or December 22, 2010. (Tr. 341).

On December 15, 2010, Plaintiff visited with Ms. Masceri, who noted that Plaintiff displayed symptoms of depressed mood and difficulty sleeping. (Tr. 345).

On January 5, 2011, Dr. Mehl–Madrona noted that Plaintiff reported feeling more depressed and complained of chronic back pain. (Tr. 347). Plaintiff had paranoid thoughts and was anxious around others. (Id.). Plaintiff reported crying spells, feeling lonely, paranoia of people "staring at me," and aggravation concerning her family. (Tr. 348). Dr. Mehl–Madrona diagnosed Plaintiff with adjustment disorder, alcohol abuse, and cannabis abuse, and added Zeprasidone to Plaintiff's medications. (Id.). Plaintiff cancelled her appointments on January 6, 2011, January 19, 2011, February 8, 2011, and February 22, 2011. (Tr. 359, 361, 363, 365).

On February 16, 2011, Dr. Mehl–Madrona completed a Psychological Assessment for the Determination of Employability for the Monroe County Department of Human Services. (Tr. 407–11). He diagnosed Plaintiff with adjustment disorder, alcohol and cannabis abuse, and chronic back pain. (Tr. 409). He also indicated emotional liability and mild paranoia. (Tr. 408). Dr. Mehl–Madrona noted that Plaintiff was moderately limited in the tasks of: following, understanding, and remembering simple instructions; performing simple and complex tasks independently; maintaining attention and concentration for role tasks; demonstrating the capacity to regularly

attend to a routine and maintaining a schedule; maintaining basic standards of hygiene and grooming; and performing low-stress and simple tasks. (Tr. 409). He found that Plaintiff could work for up to 10 hours per week with reasonable accommodations, but she could not work for 40 hours per week. (Tr. 409). He determined that Plaintiff should not have too much contact with people, should not work with the public, and should not be exposed to loud environments or high-pressure situations. (Tr. 410).

On March 3, 2011, Dr. Kavintha Finnity, a consultative psychiatric examiner, evaluated Plaintiff. (Tr. 380). Plaintiff reported depressive symptoms such as dysphoric mood, crying, irritability, loss of interest, loss of energy, and social withdrawal. (Tr. 380). Plaintiff also reported a history of panic attacks and difficulty with short term memory. (*Id.*). Dr. Finnity assessed major depressive disorder and anxiety disorder and recommended that Plaintiff continue psychological and psychiatric treatment. (Tr. 382). Dr. Finnity opined that Plaintiff could follow and understand simple directions and perform simple tasks; maintain attention, concentration, and a regular schedule; learn new tasks and perform complex tasks; make appropriate decisions; and manage her funds. (*Id.*). Dr. Finnity noted that Plaintiff had difficulty relating with others and dealing with stress. (*Id.*).

On March 3, 2011, Dr. George Alexis Sirotenko performed a consultative medical examination. (Tr. 402). Plaintiff did not have a primary care physician and had no record of imaging studies, physical therapies, or surgical evaluations. (*Id.*). Dr. Sirotenko noted that Plaintiff's gait was normal, and she did not require any assistive device. (Tr. 403). Plaintiff's range of motion and strength were normal for all joints and the spine. (*Id.*). Plaintiff's hand and finger dexterity were intact

and grip strength was full bilaterally. (Tr. 404). Plaintiff reported a "dull, toothache-like pain" in her paralumbar distribution made worse by sitting, standing, or walking for more than one hour. (Tr. 402). Dr. Sirotenko assessed a "subjective history of back pain, current examination is stable," a history of anxiety and depression, and ongoing marijuana use. (Tr. 404–05). Dr. Sirotenko opined that Plaintiff had a fair prognosis and no "frank" physical limitations. (Tr. 405).

On March 14, 2011, Dr. R. Altmansberger, a State agency non-examining psychiatric consultant, reviewed Plaintiff's record as of that date and adopted Dr. Finnity's opinion that Plaintiff was able to perform work-related activities with some limitations. (Tr. 400). Dr. Altmansberger opined that Plaintiff was able to perform work-related tasks in a low-contact setting. (*Id.*).

On March 16, 2011, Plaintiff visited Nurse Monika Quistorf, who noted that Plaintiff's speech was mildly pressured and her mood was anxious, but the remainder of Plaintiff's examination was normal. (Tr. 375).

On April 13, 2011, Plaintiff visited Ms. Masceri, who noted that Plaintiff was depressed and anxious. (Tr. 416). Ms. Masceri reported on April 19, 2011, that Plaintiff appeared jittery and attributed paranoid thoughts to her son. (Tr. 417). Plaintiff's affect was appropriate, but her mood was depressed. (*Id.*).

On May 3, 2011, Ms. Masceri noted that Plaintiff reported drinking beer, and Ms. Masceri indicated that Plaintiff's alcohol use may contribute to Plaintiff's difficulty in managing daily tasks. (Tr. 418). Plaintiff showed difficulty with memory, difficulty maintaining appointments, and a guarded and fatigued affect. (*Id.*).

On July 19, 2011, Dr. Bertholet Bavibidila of Lifetime Health Medical Group completed a physical examination of Plaintiff. (Tr. 426). Plaintiff complained of itching and a rash, depression and anxiety, restless legs, wrist symptoms, and noted that she had been recently treated in the emergency room after being stabbed with an ice pick. (*Id.*). Dr. Bavibidila noted that Plaintiff did have a rash, but observed no abnormalities of the back, spine, musculature, arms, or legs. (Tr. 428). Dr. Bavibidila assessed dermatitis and prescribed a steroid cream and referred Plaintiff to neurology for carpal tunnel and restless leg syndrome. (Tr. 429).

On November 3, 2011, Nurse Quistorf reported that Plaintiff showed mild depression and anxiety. (Tr. 420). Ms. Masceri also worked with Plaintiff on that date with a goal of helping Plaintiff process her trauma after being stabbed. (Tr. 419).

On November 4, 2011, Ms. Masceri completed a Psychological Assessment for the Determination of Employability for the Monroe County Department of Human Services. (Tr. 411–14). Ms. Masceri noted Plaintiffs diagnoses as anxiety disorder, cocaine abuse, chronic back pain, and moderate psychosocial stressors. (Tr. 413). She indicated that Plaintiff's condition had not improved because Plaintiff had increased trauma. (Tr. 412). Ms. Masceri opined that Plaintiff could not work any hours per week, even with reasonable accommodations. (Tr. 413). She further noted that Plaintiff was very limited in the following tasks: following and remembering simple instructions; performing simple and complex tasks independently; maintaining attention and concentration for role tasks; demonstrating the capacity to regularly attend to a routine and maintain a schedule; maintaining basic standards of hygiene and grooming; and performing low-stress and simple tasks. (*Id.*).

Plaintiff informed Ms. Masceri on December 5, 2011, that she had been off of her medications for two weeks. (Tr. 421).

On December 14, 2011, Dr. Saleem Ismail from Genesee Mental Health Center noted that Plaintiff had missed appointments and medications for approximately one and a half months after she was stabbed while on the bus. (Tr. 422). Plaintiff reported back pain, but stated that she was able to watch television, clean, and cook. (*Id.*). Plaintiff cried during her examination and indicated that she had anxiety about riding on the bus because she had been stabbed. (*Id.*). Dr. Ismail assessed Plaintiff with a history of anxiety, mood liability, anger, and avoidance with difficulty adjusting to psychosocial stressors and recent physical trauma. (*Id.*). Dr. Ismail also noted a current diagnosis of depressive disorder, back ache, and carpal tunnel. (*Id.*).

### D. Determining Disability Under the Social Security Act and the ALJ's Decision

■ The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin*, No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Drae-*

*gert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claim-ant has the burden on the first four steps.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

Here, in applying the five-step sequential evaluation, ALJ Diamond made the following determinations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 8, 2010, the date of her application. (Dkt. 1–1 at 7). At the second step, the ALJ found that Plaintiff has the following severe impairments: major depressive disorder, anxiety disorder, and history of cocaine and marijuana abuse. (*Id.*). The ALJ also noted that Plaintiff complained of back pain, but the ALJ found that this was, "at best, non-severe," as it was unsupported by the medical records. (*Id.*). At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render her disabled. (*Id.*). Accordingly, at the fourth step, the ALJ determined Plaintiff's residual functional capacity to perform work. (*Id.* at 9–10). The ALJ concluded that plaintiff had the following RFC:

> [t]o perform a full range of work at all exertional levels but with the following non-exertional limitations. The claimant can perform simple, routine tasks with no public contact and only occasional contact with supervisors and coworkers. She can engage in low stress work, which is defined as occasional decision-making, occasional changes in work setting, and tasks that do not require a production rate pace.

(*Id.*).

The ALJ then proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed Plaintiff's job qualifications by considering her physical

ability, age, and education. (*Id.* at 9–12). At the time the application was filed, Plaintiff was 39 years old, she had an tenth-grade education, and had no relevant past work. (*Id.* at 12). Second, the ALJ determined whether there were jobs existing in the national economy that a person with Plaintiff's qualifications and RFC could perform. (*Id.*). ALJ Diamond found that Plaintiff's ability to perform work at all exertional levels was compromised by Plaintiff's nonexertional limitations, but, based on the VE's testimony, the ALJ found that Plaintiff was still able to work. (*Id.*). Relying on the VE's testimony, the ALJ concluded that Plaintiff was able to perform the representative jobs of machine feeder, hand packager, or sorter, as jobs existing in the national economy. (*Id.* at 13).

## III. DISCUSSION

### A. Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46–47 (2d Cir.1996).

Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

### B. Step Two Consideration of Carpel Tunnel or Restless Leg Syndrome

Plaintiff argues that the ALJ failed to consider if Plaintiff's carpal tunnel syndrome or restless leg syndrome were severe or non-severe impairments, and that therefore the RFC could not be based on substantial evidence. (Dkt. 12–1 at 17). The Commissioner argues that Plaintiff has not established that these impairments were medically determinable impairments. (Dkt. 14–1 at 18–19).

In her application for benefits, Plaintiff stated that she was disabled due to depression, anxiety, and back problems. (Tr. 172). Although Plaintiff testified that she had carpal tunnel syndrome at the hearing, she did not mention restless leg syndrome, and the only medical evidence in the record indicating that Plaintiff may have carpal tunnel or restless leg syndrome is Dr. Bavibidila's July 19, 2011 assessment referring Plaintiff to neurology for examination of her related complaints, and noting that Plaintiff had a ganglion cyst in her left wrist. (Tr. 428). There are no records diagnosing Plaintiff with carpal tunnel or restless leg syndrome, and Plaintiff's assertions of such impairments are insufficient to establish that they existed. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir.2009) (finding plaintiff's subjective complaints were insufficient to establish a disability where they were unsupported by objective medical evidence).

Further, there is no evidence in the record to suggest that Plaintiff followed up with a neurologist to receive evaluation or treatment for carpal tunnel or restless leg syndrome. *See Stroud v. Comm'r of Soc. Sec.*, No. 13 Civ. 3251(AT)(JCF), 2014 WL 4652581, at *11 (S.D.N.Y. Sept. 8, 2014) (holding the ALJ was permitted to consider fact claimant had not sought treatment for her alleged back pain); *see also Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) (finding claimant's failure to seek medical attention "seriously undermine[d]" contention of disability); *Mahoney v. Apfel*, 48 F.Supp.2d 237, 246 (E.D.N.Y.1999) ("To be sure, the ALJ is permitted to attach significance to plaintiff's failure to seek medical treatment.").

Plaintiff argues that it was error for the ALJ to not discuss or analyze Plaintiff's carpel tunnel or restless leg syndrome. (Dkt. 16 at 1). Even if it was an error for the ALJ to neglect to specifically mention Plaintiff's complaints of carpal tunnel or restless leg syndrome in her decision, such an error would be harmless in light of the fact that the record does not show these alleged ailments as medically determinable impairments. *See Mendoza v. Astrue*, No. 6:06–CV–1233, 2008 WL 5054243, at *9 (N.D.N.Y. Nov. 20, 2008) ("[I]n this instance the objective medical evidence does not support the limitations asserted by Drs. Bhatt and Garbooshian, and thus does not undermine the ALJ's finding that plaintiff's carpal tunnel syndrome did not qualify as severe at step two of the disability[ ]analysis.").

Accordingly, the ALJ did not commit reversible error at Step Two of her analysis.

### C. Treating Physician Rule

Plaintiff argues that the ALJ failed to properly evaluate the opinions of Dr. Mehl–Madrona and Ms. Masceri, and also erred by not developing the record further when she determined that their medical opinions were inconsistent with their notes. (Dkt. 12–1 at 20).

 Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations...." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The "treating physician rule" requires the ALJ to give "controlling weight" to the opinion of a claimant's treating physician regarding "the nature and severity of [the claimant's] impairment(s) ... [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). As explained by the Second Circuit Court of Appeals:

An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). An ALJ does not have to explicitly walk through these factors, so long as the Court can "conclude that the ALJ applied the substance of the treating physician rule ... and provide[d] 'good reasons' for the weight she gives to the treating source's opinion." *Id.*

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Id.*

Here, the ALJ assigned "little weight" to the opinions of Dr. Mehl–Madrona and Ms. Masceri, finding that they were "not supported by the record." (Dkt. 1–1 at 11).

### 1. Dr. Mehl–Madrona

■ Dr. Mehl–Madrona noted that Plaintiff was moderately limited in the tasks of: following, understanding, and remembering simple instructions; performing simple and complex tasks independently; maintaining attention and concentration for role tasks; demonstrating the capacity to regularly attend to a routine and maintaining a schedule; maintaining basic standards of hygiene and grooming; and performing low-stress and simple tasks. (Tr. 409). He found that Plaintiff could work for up to 10 hours per week with reasonable accommodations, but she could not work for 40 hours per week. (*Id.*). He determined that Plaintiff should not have too much contact with people, should not work with the public, and should not be exposed to loud environments or high-pressure situations. (Tr. 410).

Plaintiff specifically argues that the ALJ erred by failing to adopt the findings of Dr. Mehl–Madrona that Plaintiff was limited to participating in work activities for only 10 hours per week with reasonable accommodations. (Dkt. 12–1 at 26 (citing Tr. 409–10)). In rejecting this opinion, the ALJ specifically referenced Plaintiff's testimony and the medical evidence suggesting that Plaintiff was able to engage in daily activities, go to the store, relate to friends and relatives, and do chores around her home. (Dkt. 1–1 at 12). The ALJ found that "the record does not indicate that the claimant is mentally unable to work on a full time and sustained basis." (*Id.* at 11–12). The ALJ noted that Plaintiff's memory and concentration were intact throughout her examinations in the record, and that her stated reason for not looking for work was because she was being taken care of by her significant other. (*Id.* at 12). The Court finds that these reasons provide substantial evidence for the ALJ's determination that Dr. Mehl–Madrona's opinion was not fully supported by the record.

In addition, despite the fact that Dr. Mehl–Madrona was Plaintiff's treating psychiatrist, the record demonstrates that Plaintiff only visited with Dr. Mehl–Madrona three times over the course of two

years. (Tr. 324, 347, 409). The infrequency of visits further suggests that it was appropriate for the ALJ to afford Dr. Mehl–Madrona's opinion little weight.

## 2. Ms. Masceri

Plaintiff contends that the ALJ erred by not giving Ms. Masceri's opinion controlling weight because she was a treating source. (Dkt. 12–1 at 22–23). Plaintiff also argues that the ALJ mischaracterized Ms. Masceri's treatment notes by pointing to only three out of approximately twenty notes in the record to demonstrate instances where Plaintiff was showing logical thought processes and utilizing coping skills. (*Id.* at 23). The Commissioner argues that the ALJ was not required to give Ms. Masceri's opinion controlling weight because she is a social worker who is not considered an acceptable medical source. (Dkt. 14–1 at 20). Plaintiff notes that Ms. Masceri is an acceptable "other source" whose opinion may be considered. (Dkt. 16 at 3).

SSR 06–03p provides that the ALJ must at least consider relevant medical evidence in the case record provided by "[m]edical sources who are not 'acceptable medical sources,' such as ... licensed clinical social workers...." SSR 06–03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability ... decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence allows a ... reviewer to follow the adjudicator's reasoning...." *Id.* at *6.

In other words, " '[w]hile the Commissioner is thus free to decide that the opinions of 'other sources' ... are entitled to no weight or little weight, those decisions should be explained.' " *Oaks v. Colvin*, No. 13–CV–917–JTC, 2014 WL 5782486, at *8 (W.D.N.Y. Nov. 6, 2014) (quoting *Sears*

*v. Astrue*, No. 2:11–CV–138, 2012 WL 1758843, at *3 (D.Vt. May 15, 2012)).

■ Here, ALJ Diamond was entitled to assign Ms. Masceri's opinion that Plaintiff was unable to work little weight, and she explained how she believed that Ms. Masceri's opinion was not supported by the record. (Dkt. 1–1 at 12–13). The ALJ found that "[t]he record does not indicate that the claimant is mentally unable to work on a full time and sustained basis." (Dkt. 1–1 at 11–12). The ALJ noted that Plaintiffs memory and concentration were intact throughout her examinations in the record and that Ms. Masceri had noted that Plaintiff was applying the coping skills learned in therapy. (*Id.* at 12). The ALJ noted that Plaintiff testified that she was able to take care of her personal grooming, cook, clean, shop, and socialize. (*Id.*). Accordingly, the ALJ did not err in assigning little weight to Ms. Masceri's "other source" opinion.

## 3. Duty to Further Develop the Record

Plaintiff argues that the ALJ was required to re-contact Dr. Mehl–Madrona and Ms. Masceri for clarification once she found that there was inconsistency in their opinions. (Dkt. 12–1 at 24–25). The Commissioner maintains that the record was fully developed, and because there was sufficient evidence to make a decision, the ALJ was not required to re-contact Plaintiff's treating sources to clarify the record. (Dkt. 14–1 at 21–22).

■ An ALJ may be required to re-contact medical sources to clarify the medical record. *See Ulloa v. Colvin*, No. 13 Civ. 4518(ER), 2015 WL 110079, at *11 (S.D.N.Y. Jan. 7, 2015) ("The ALJ must 'seek additional evidence or clarification when the report from [the] claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or

does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.' ") (quoting *Calzada v. Astrue,* 753 F.Supp.2d 250, 269 (S.D.N.Y. 2010) (quotations omitted)). However, "[a]n ALJ is not required to explicitly analyze every piece of conflicting evidence in the record." *Murphy v. Comm'r of Soc. Sec.,* No. 3:13–CV–0960 (GTS/ATB), 2015 WL 64440, at *3 (N.D.N.Y. Jan. 5, 2015) (citing *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981), *Mongeur,* 722 F.2d at 1040).

 Here, the record showed that Plaintiff had logical thought processes, appropriate affect, and intact memory on multiple occasions. (Tr. 221, 223, 276, 309, 310, 317, 336, 345, 347, 381, 417, 428). Further, Dr. Mehl–Madrona indicated on one occasion that Plaintiff was doing well and was stable. (Tr. 345). On more than one occasion, Plaintiff's impairments were noted to be impacted by her alcohol or substance abuse as compared to her mental status. (Tr. 289, 297, 418). Based on this information, the ALJ's opinion was supported by substantial evidence. Additionally, the ALJ did not explicitly find that there was an inconsistency in either Dr. Mehl–Madrona or Ms. Masceri's opinion, she simply noted that there were medical records to suggest that Plaintiff was not so limited. (Dkt. 1–1 at 11–12). The ALJ did not need to seek out additional information, because there were no obvious gaps in the administrative record. *See Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.").

### 4. Weight Assigned to Non–Treating Sources

Plaintiff contends that the ALJ erred by according significant weight to the non-treating source Dr. Finnity and the non-examining source Dr. Altmansberger over the opinions of Dr. Mehl–Madrona and Ms. Masceri. (Dkt. 12–1 at 26). The Commissioner maintains that it was appropriate for the ALJ to give significant weight to the opinions of these consultative examiners because the opinions were supported by the medical evidence. (Dkt. 14–1 at 21).

Under 20 C.F.R. § 416.927(e)(2)(i):
State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence. . . .

 "[W]hen there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.' " *Harris v. Astrue,* No. 07–CV–4554 (NGG), 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) (quoting *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir.1990)). However, an examining physician's opinion may constitute substantial evidence to support an ALJ's decision, provided the opinion is supported by evidence in the record. *See Diaz v. Shalala,* 59 F.3d 307, 313 n. 5 (2d Cir.1995); *see also Smith v. Colvin,* 17 F.Supp.3d 260, 268 (W.D.N.Y.2014) ("[T]he opinions of consulting sources 'may constitute substantial evidence if they are consistent with the record as a whole.' ") (quoting *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 79 (N.D.N.Y.2005)). "This is particularly so where the consultant directly examines the applicant." *Id.* at 268.

■ Here, Dr. Finnity directly examined Plaintiff, and her opinion is supported by medical evidence in the record. Dr. Finnity opined that Plaintiff could follow and understand simple directions and perform simple tasks; maintain attention and concentration and a regular schedule; learn new tasks and perform complex tasks; make appropriate decisions; and manage her funds. (Tr. 382). Dr. Finnity found that Plaintiff's attention and concentration were intact as she was able to complete serial threes tests accurately. (Tr. 381). Dr. Finnity also tested Plaintiff's recent and remote memory skills, and Plaintiff was able to recall three out of three objects immediately and two out of three objects after five minutes. (*Id.*). Plaintiff was able to recall five digits forward and three digits backward. (*Id.*).

Dr. Finnity noted that Plaintiff had difficulty relating with others and dealing with stress. (Tr. 382). These were the primary mental limitations identified in Plaintiff's own testimony as well as the treatment notes of various mental health providers. (Tr. 43, 275, 315, 347, 382, 400, 410, 413). The ALJ accounted for this restriction in her RFC finding. (Dkt. 1–1 at 9). As a result, the ALJ did not err in affording Dr. Finnity's well-supported opinion significant weight.

Although Dr. Altmansberger did not physically examine Plaintiff, his opinion is supported by Plaintiff's medical records. Dr. Altmansberger reviewed Plaintiff's medical record and concurred with Dr. Finnity's conclusion that plaintiff was able to perform work-related tasks, and opined that Plaintiff should be restricted to a low-contact setting. (Tr. 400). Again, Dr. Altmansberger's opinion is supported by the ample medical evidence in Plaintiffs record suggesting that her primary mental limitation was interacting with others and avoiding high-stress situations. It was not an error for the ALJ to afford significant

weight to Dr. Altmansberger's conclusion in restricting Plaintiff to low stress work with no public contact. (Dkt. 1–1 at 9–10).

Further, it is worth noting that the opinions of Dr. Mehl–Medrona and Ms. Masceri were essentially "form reports composed of checklists and fill-in-the-blank statements." *Gray v. Astrue*, No. 09–CV–00584, 2011 WL 2516496, at *5 (W.D.N.Y. June 23, 2011). Form reports of this sort are, by their nature, of limited evidentiary value. *See id.* (citing *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir.1993)).

Given this particular administrative record and the circumstances of this case, the ALJ did not err when she assigned "significant weight" to the medical source statements provided by Dr. Finnity and Dr. Altmansberger but "little weight" to the opinions of Dr. Mehl–Madrona and Ms. Masceri.

**D. Credibility**

Finally, Plaintiff argues that the ALJ's credibility analysis was "fatally flawed" because the language of her decision suggests that she reached her RFC determination before making her credibility assessment. (Dkt. 12–1 at 28–29).

This argument has been rejected by this Court. *See Diakogiannis v. Astrue*, 975 F.Supp.2d 299, 318–19 (W.D.N.Y.2013) (determining the ALJ's credibility assessment was supported by substantial evidence where the ALJ assessed the plaintiff's subjective complaints "in the context of a comprehensive review of the entire medical record," despite the use of the boilerplate language that the plaintiff's complaints were "inconsistent with the above residual functional capacity"); *Luther v. Colvin*, No. 12–CV–6466, 2013 WL 3816540, at *7–8 (W.D.N.Y. July 22, 2013) (finding ALJ properly assessed plaintiff's credibility despite boilerplate language in opinion that plaintiff's alleged symptoms were "incon-

sistent with the above residual functional capacity"). Indeed, courts in this Circuit have stated that it is inappropriate for an ALJ to base his or her credibility determination "solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding." *Burton v. Colvin*, No. 6:12–CV–6347(MAT), 2014 WL 2452952, at *11 (W.D.N.Y. June 2, 2014). "Read in context, however, this statement does not [necessarily] indicate that the RFC assessment was a basis for a finding of lack of credibility." *Briscoe v. Astrue*, 892 F.Supp.2d 567, 585 (S.D.N.Y.2012); *see also Abdulsalam v. Comm'r of Soc. Sec.*, No. 5:12–CV–1632(MAD), 2014 WL 420465, at *7 (N.D.N.Y. Feb. 4, 2014) ("this erroneous boilerplate language does not merit remand if the ALJ offers specific reasons to disbelieve the claimant's testimony") (internal quotation omitted).

In the instant case, Plaintiff takes the ALJ's boilerplate language out of context. "[I]t is not sufficient for an ALJ to merely state that he finds the claimant incredible to the extent that her complaints are inconsistent with his RFC determination ... though, '[f]ailure to *expressly* consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination.'" *Kunkel v. Comm'r of Soc. Sec.*, No. 12–CV–6478, 2013 WL 4495008, at *3 (W.D.N.Y. Aug. 20, 2013) (quoting *Wischoff v. Astrue*, No. 08–CV–6367, 2010 WL 1543849, at *7 (W.D.N.Y. Apr. 16, 2010)).

█ Here, the ALJ properly explained why she found that Plaintiff's testimony was not entirely credible because she considered Plaintiff's testimony as part of her RFC analysis. In formulating her RFC, the ALJ did explicitly consider Plaintiff's testimony. The ALJ considered the objective medical evidence, Plaintiffs activities of daily living, medications, treatment history, and allegations, as well as the opinions of treating and non-treating physicians. (Dkt. 1–1 at 9–12). The ALJ also explicitly stated that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96–4p and 96–7p." (Dkt. 1–1 at 9). ALJ Diamond then proceeded to thoroughly discuss Plaintiff's testimony and the medical opinions in the record. (Dkt. 1–1 at 9–12).

For example, the ALJ noted that Plaintiff testified that she did not like being around people or crowds and that she had trouble with her hands and with her memory. (Dkt. 1–1 at 9–10). However, the ALJ also noted that Plaintiff testified that she was able to care for herself, babysit her grandchildren, and attend religious services. (*Id.* at 9). The ALJ noted that Plaintiff claimed to be compliant with her medications and that the medications helped to alleviate Plaintiff's symptoms. (*Id.*). Objective medical evidence indicated that Plaintiff had found success using coping skills. (*Id.* at 11). Further, the ALJ noted that Plaintiff's stated reason for not working was unrelated to her mental impairments. (*Id.* at 12).

Despite the use of boilerplate language, the ALJ thoroughly discussed Plaintiffs testimony and the evidence in the medical record that the ALJ believed contradicted Plaintiff's testimony. As a result, the Court finds that the ALJ did not err in conducting her credibility analysis.

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the

Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 14) is granted, and Plaintiff's motion for judgment on the pleadings (Dkt. 12) is denied. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.