Brian Michael CAMILLE, Plaintiff,

v.

Carolyn W. COLVIN, Acting
Commissioner of Social
Security, Defendant.

No. 14–CV–6155 EAW.

United States District Court,
W.D. New York.

Signed May 19, 2015.

Justin M. Goldstein, Law Offices of Kenneth Hiller, PPLC, Amherst, NY, for Plaintiff.

Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, Sergei Aden, Social Security Administration, New York, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

### I. INTRODUCTION

Plaintiff Brian Michael Camille ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for disability benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Susan Wakshul was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 7, 9). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings (Dkt. 9) is granted, and Plaintiff's motion (Dkt. 7) is denied. Plaintiff's complaint is dismissed with prejudice.

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### A. Overview

On June 17, 2011, Plaintiff protectively filed an application for disability insurance benefits. (Administrative Transcript (hereinafter "Tr.") 44, 169–76). On Octo-

ber 4, 2011, Plaintiff also filed an application for disabled adult child benefits. (Tr. 45; 169–76). Plaintiff alleged a disability onset date of November 1, 2009. (Tr. 169). In his application, Plaintiff alleged the following disabilities: depression, bipolar, anger problems, ADHD, syncope, anxiety, and seizures. (Tr. 181). The Commissioner denied Plaintiff's application, and Plaintiff requested a hearing by an ALJ on August 30, 2012. (Tr. 162).

On September 6, 2012, Plaintiff, represented by counsel, testified at a hearing via videoconference before ALJ Wakshul. (Tr. 9–42). Vocational Expert ("VE") Esperanza J. DiStefano also appeared and testified. (Tr. 36–43). On September 28, 2012, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Dkt. 1–2 at 2–19).

On February 27, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Dkt. 1–3 at 2–5). On April 1, 2014, Plaintiff filed this civil action appealing the final decision of the Commissioner. (Dkt. 1).

## B. The Non–Medical Evidence

At the time of the administrative hearing, Plaintiff was a 24–year–old male. (Tr. 14). Plaintiff measured 5′9″ and weighed approximately 257 pounds. (*Id.*). Plaintiff had previous work experience as a baker's assistant. (Tr. 17).

### 1. Plaintiff's Testimony

Plaintiff testified that he was single and lived with his mother and two sisters. (Tr. 15). He had a driving permit but no license because he had taken the driving test three times and failed. (Tr. 16). Plaintiff testified that he was asked to leave his most recent job after he missed four days of work, which Plaintiff claims he missed as a result of his anxiety. (Tr. 17–18). From 2007 through 2012, Plaintiff

applied for a new job "around three/four times." (Tr. 18). Plaintiff testified that "the very thought of work" would cause him to have anxiety. (Tr. 19). He stated that he had difficulty working with other people or dealing with customers. (*Id.*).

Plaintiff testified that he regularly saw psychiatrist Dr. Dawood, and that Dr. Herbowy was his primary care physician. (Tr. 20).

Plaintiff was taking amphetamine salts for his ADHD, and he testified "it ha[d] been helping a lot." (Tr. 20). Plaintiff had been taking lamotrigine for his mood swings, but his doctor had switched his prescription to Cymbalta the day before the hearing. (Tr. 21). Plaintiff was also taking Adderall. (Tr. 22). Plaintiff testified that he had no negative side effects from the Adderall, and that the medication had given him some energy and motivation. (*Id.*). Plaintiff testified that he had anger management issues that would cause him to hit objects out of anger and lose control of his anger. (Tr. 35–36).

Plaintiff testified that when he was experiencing depression, he would either "constantly eat" or "barely eat," and would "really want to curl up and cry or curl up in a corner and die." (Tr. 34).

ALJ Wakshul asked Plaintiff if he had sought treatment with a therapist in accordance with the recommendation of his psychiatrist, and Plaintiff stated that he had not treated with a therapist. (Tr. 24–25).

Plaintiff testified that he had difficulty remembering things, and he sometimes had "a really hard time concentrating on one task without being distracted by something else." (Tr. 27).

Plaintiff testified that humidity, "real heavy exercise," or cold weather may cause him to have an asthma attack, but

stated that he was prescribed an inhaler that helped with the attacks. (Tr. 25–26).

Plaintiff stated that he had trouble falling asleep and would often sleep until the afternoon when he did fall asleep. (Tr. 29). Plaintiff made an effort to get out of the house when he was able, and would play video games during the day. (Id.). Plaintiff would use the computer to chat with friends. (Tr. 30).

Plaintiff testified that he washed dishes, did his own laundry, mowed the lawn, occasionally shoveled the driveway, and went grocery shopping with his mother. (Tr. 31–32). Plaintiff stated that he would like to work one day and live on his own. (Tr. 32–33).

### 2. Vocational Expert Testimony

The ALJ presented VE DiStefano with a hypothetical question. (Tr. 37–38). The VE was asked to consider someone of Plaintiff's age, education, and experience who could perform work at all exertional levels but was limited to simple, routine, repetitive tasks and should have "no more than occasional changes to the work setting and occasional use of judgment; occasional decision-making; occasional and superficial interaction with co-workers and supervisors; no interaction with the public; and should have no exposure to hazards." (Tr. 37). The VE responded that the hypothetical individual could be employed as a laundry worker, hand packager, or mail clerk. (Tr. 38).

The ALJ posed a second hypothetical to the VE placing the same additional restrictions to an individual capable of only medium work. (Id.). The VE responded that such an individual would be able to perform the same jobs of laundry worker, hand packager, or mail clerk. (Tr. 38–39).

In a third hypothetical, the VE was asked to consider the same individual from the second hypothetical with the additional restriction of needing to be isolated with occasional supervision. (Tr. 39). The VE stated that the same positions were available. (Id.).

In a fourth hypothetical, the VE was asked to consider the same individual from the third hypothetical who was only able to perform light work. (Id.). The VE testified that such an individual could work as an office helper or mail clerk. (Id.).

### C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

Plaintiff received mental health counseling with therapist Patrice Gregerk Goodrich, LCSW–R of Waves of Life Therapy from June 24, 2008 through September 23, 2010. (Tr. 388–89). Ms. Goodrich completed a report summarizing Plaintiffs treatment during that time. (Id.). Ms. Goodrich noted that Plaintiff had been engaged to be married, but the relationship ended in 2009. (Id.). Plaintiff had worked for a bakery for approximately three months in 2008, and was advised to pursue Vocational and Educational Services for Individuals with Disabilities ("VESID"). (Id.). Treatment ended with Ms. Goodrich due to loss of contact and a failed outreach attempt. (Id.). Ms. Goodrich recommended that Plaintiff reengage in treatment, pursue VESID, and continue to see a psychiatrist for medication as needed. (Tr. 389).

On December 14, 2009, Christine William, M.D. began treating Plaintiff. (Tr. 244). Plaintiff was assessed with an upper respiratory infection. (Id.).

On February 4, 2010, Plaintiff treated with Dr. William for a right hand injury following punching a wall during an argument with his mother. (Tr. 243). Plaintiff

had pain and swelling in his right hand. (*Id.*).

On February 16, 2010, Dr. Williams noted a history of mood disorder, depression, headaches, nasal congestion, irritable bowel syndrome, multiple head trauma, and syncope with a seizure during syncope. (Tr. 245). Plaintiff reported decreased appetite and loss of interest. (Tr. 246). On examination, Dr. Williams noted lumbosacral tenderness. (Tr. 247).

On February 17, 2010, Dr. William treated Plaintiff's right hand injury, "GERD," and allergic rhinitis. (Tr. 242). A CT scan of Plaintiff's head on February 18, 2010, revealed chronic paranasal sinusitis. (Tr. 271).

On June 4, 2010, Plaintiff treated with plastic surgeon Timothy P. O'Connor, M.D. F.A.C.S. for hand pain. (Tr. 255). Dr. O'Connor noted physical findings of a "boxer fracture." (*Id.*).

On June 30, 2010, psychiatrist Muhammad Dawood, M.D. treated Plaintiff for complaints of "anger and rage." (Tr. 277–80). Plaintiff had been in outpatient psychiatric treatment since age 12 or 13. (Tr. 277). Plaintiff reported recently punching a hole in the wall and experiencing symptoms of difficulty breathing, nausea, sweating, and change in energy and mood level. (*Id.*). Plaintiff stated that he was applying for VESID, but he was currently unemployed because he just "can't get motivated." (Tr. 278). On mental status examination, Plaintiff had a flat affect. (Tr. 279). Plaintiff was able to recall three of three items after five minutes, and was able to do serial threes and serial sevens testing. (*Id.*). A Quick Inventory of Depressive Symptomology ("QUIDS") produced a score of 11, indicating moderate range depression. (*Id.*). Dr. Dawood diagnosed panic disorder, anxiety disorder, bipolar II disorder, depression, and rule-out depressive disorder versus bipolar I

disorder. (Tr. 280). Plaintiff's Global Assessment of Functioning ("GAF") score was 55. (*Id.*). Plaintiff was prescribed Risperdal, Lamictal, Lexapro, and Trazodone. (*Id.*).

Dr. Dawood treated Plaintiff on January 29, 2011, and diagnosed chronic panic disorder without agoraphobia, chronic anxiety disorder, chronic bipolar disorder II with most recent episodes hypomanic, and chronic bipolar disorder I. (Tr. 363). Dr. Dawood noted that Plaintiff "has chronic condition and on medications with fair stability and chronic disability in many area [sic]." (Tr. 362). Plaintiff was assigned a GAF score of 55. (Tr. 363). Plaintiff was prescribed Lamictal, Risperdal, Trazodone, Lexapro, and Wellbutrin XL. (Tr. 363–64).

Plaintiff followed up with Dr. Dawood on February 12, 2011, reporting poor sleep habits and lack of motivation. (Tr. 365). Plaintiff claimed that he was distracted and forgetful, experienced excessive fatigue, and continued to have depression and anxiety symptoms. (*Id.*). On mental status examination, Dr. Dawood described Plaintiff as "flat, glum, attentive, fully communicative, over weight [sic], and looks unhappy." (*Id.*). Dr. Dawood increased Plaintiff's dosage of Wellbutrin XL and continued Plaintiff's other medications. (Tr. 366).

On February 23, 2011, Plaintiff visited Dr. William after Plaintiff passed out on February 17, 2011. (Tr. 241). Dr. William assessed a vasovagal syncopal attack and referred Plaintiff to Dr. Louis Medved, M.D. for a sleep study. (*Id.*).

On February 24, 2011, Plaintiff treated with Dr. Dawood after calling the previous day "rather panic [sic]." (Tr. 281–83). Plaintiff claimed that he had panic attacks a few times per week and that he continued to be unmotivated. (Tr. 281). Dr.

Dawood noted that Plaintiff appeared "glum," unhappy, and anxious. (*Id.*). He diagnosed chronic panic disorder without agoraphobia, chronic anxiety disorder, chronic bipolar disorder II, and bipolar disorder I. (Tr. 282). Dr. Dawood discontinued Plaintiffs Wellbutrin prescription as Plaintiff reported that he had passed out on February 17, 2011, and experienced two days of confusion after. (Tr. 283). Plaintiff's other medications were continued. (*Id.*).

On March 11, 2011, Dr. Medved evaluated Plaintiff for a suspected seizure disorder. (Tr. 249–51). Dr. Medved opined that Plaintiffs episodes may be related to micturition syncope. (Tr. 250). He ordered an MRI to rule out a focal lesion. (Tr. 251). The March 16, 2011 brain MRI revealed bilateral maxillary sinus disease. (Tr. 269).

On March 24, 2011, Plaintiff treated with Dr. Dawood reporting difficulty remembering things and decreased sociability. (Tr. 367). Plaintiff indicated that Risperdal helped control his anger episodes. (*Id.*). Plaintiff reported that his anxiety was "pretty much in control." (*Id.*). Dr. Dawood noted that Plaintiff had suspected syncopal attacks. (*Id.*). He also wrote that Plaintiff was "stable on medications tolerated medications" but was "rather disable [sic] and can not [sic] be gainfully employed." (Tr. 369). He increased Plaintiff's dosage of Lamictal and continued Plaintiff's additional medications. (*Id.*).

On May 5, 2011, Plaintiff told Dr. Dawood that he had good and bad days. (Tr. 371). Plaintiff reported getting angry and having an argument with his sister. (*Id.*). Dr. Dawood noted that Plaintiff was slow to respond and had slow and soft speech. (*Id.*). Plaintiff's body language and posture conveyed an underlying depressed mood. (*Id.*). Dr. Dawood again increased Plaintiffs dosage of Lamictal, and the remaining medications were continued. (Tr. 372).

On June 22, 2011, Dr. Dawood completed a mental residual functional capacity questionnaire. (Tr. 373–78). Dr. Dawood noted that Plaintiff would be unable to meet competitive standards in: remembering work-like procedures; maintaining regular attendance; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being unduly distracted; performing at a consistent pace without an unreasonable number and length of rest periods; and accepting instructions and responding appropriately to criticism. (Tr. 376). Dr. Dawood checked the box indicating that Plaintiff would miss more than four days of work per month. (Tr. 378). He noted that Plaintiff was not a malingerer and that his impairments had lasted or could be expected to last for at least 12 months. (*Id.*). Dr. Dawood also checked the box stating that Plaintiff could not engage in full-time competitive employment on a sustained basis. (*Id.*).

Dr. Dawood treated Plaintiff on June 30, 2011, during an "extreme manic episode." (Tr. 338–39). Plaintiff reported sleeping from 2:00 a.m. to 2:00 p.m. (Tr. 338). Plaintiff had a flat and anxious affect. (*Id.*). Dr. Dawood prescribed Neurontin, increased dosages of Lamictal and Risperdal, and decreased the dosage of Lexapro. (Tr. 339).

Plaintiff followed up with Dr. Dawood on October 8, 2011. (Tr. 284–86). Plaintiff claimed that he had anxiety attacks and continued anxiety and depression. (Tr. 284). He had recently become upset and angry and punched a tree. (*Id.*). Plaintiff reported feelings of worthlessness and anger. (*Id.*). Dr. Dawood noted that Plaintiff was slow to respond and that his body posture and attitude conveyed an underly-

ing depressed mood. (Tr. 284–85). Plaintiff's short and long term memory was intact, and Plaintiff exhibited no signs of attentional difficulties. (Tr. 285). Dr. Dawood discontinued Plaintiff's prescription for Neurontin and continued the other medications. (*Id.*).

On October 12, 2011, Dr. Dawood completed a form with respect to Plaintiffs functioning. (Tr. 287–92). He indicated that Plaintiff had a poor response to treatment and that Plaintiff lacked motivation, had a flat mood and affect, and only fair attention and concentration, memory, insight, and judgment. (Tr. 289). Plaintiff lived with his mother. (Tr. 290). Dr. Dawood stated that Plaintiff's ability to function in a work setting was "none." (Tr. 290–91).

On November 7, 2011, State agency reviewing psychological consultant E. Kamin completed a psychiatric review technique form and mental residual functional capacity form based on a review of Plaintiffs records. (Tr. 301–18). Dr. Kamin assessed moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 311). Dr. Kamin opined that Plaintiff could "sustain attention and concentration for low stress work and not working closely with others." (Tr. 317). Dr. Kamin noted that Dr. Dawood's responses that Plaintiff was limited in attention, concentration, adaptation, and social interaction were not supported by the record. (*Id.*). Dr. Kaman also noted that Plaintiff had been encouraged by Dr. Dawood to go to VESID, but Plaintiff was not motivated and did not have a driver's license. (*Id.*).

On December 15, 2011, State agency internal medicine consultant George Alexis Sirotenko, D.O. performed an examination on Plaintiff. (Tr. 319–23). Plaintiff reported doing light cooking and watching television. (Tr. 319). Dr. Sirotenko found that Plaintiff had no physical limitations and showed no evidence of impaired judgment or significantly impaired memory. (Tr. 321–22).

Plaintiff followed up with Dr. Dawood on January 7, 2012, and reported not doing well despite taking his medications. (Tr. 343). Plaintiff reported poor motivation and "jitteriness" as well as daily anger and depressive symptoms. (*Id.*). He reported racing thoughts. (*Id.*). Dr. Dawood recommended that Plaintiff see a therapist. (Tr. 344). He noted that Plaintiff was more withdrawn in the past month, "likely since he was denied his SSI." (*Id.*). Dr. Dawood discontinued Risperdal and prescribed Clonazepam and Effexor, leaving Plaintiff's prescriptions for Lamictal, Trazodone, and Lexapro intact. (*Id.*).

On April 7, 2012, Dr. Dawood noted that Plaintiff was avoiding tasks that required sustained mental effort and did not "follow through on instructions and fail[ed] to finish tasks." (Tr. 345). Plaintiff appeared listless and anergic and had a depressed thought content. (*Id.*). Plaintiff reported that he had not taken his medication for one week because he forgot to do so and indicated that he did not believe the medication made him feel any better. (*Id.*). Dr. Dawood started Plaintiff on Venlafaxine XR and Adderall and instructed him to restart his medications. (*Id.*).

On May 9, 2012, Dr. Dawood increased Plaintiff's dosage of Adderall. (Tr. 348–49). Plaintiff reported having less anger and fewer angry episodes. (Tr. 348). Plaintiff was calm, attentive, fully communicative, and relaxed. (*Id.*). Plaintiff had intact cognitive functioning, memory, and ability to abstract and perform arithmetic calculations. (*Id.*).

Plaintiff treated with Dr. Herbowy on June 6, 2012, for pain in his hand. (Tr. 351–55). He had injured his hand six days earlier after getting angry and punching his garage door. (Tr. 351).

On July 11, 2012, Plaintiff informed Dr. Dawood that he had recently punched his garage door after his family received a foreclosure letter for their house. (Tr. 379). He continued to have an irregular sleep schedule and had no motivation. (*Id.*). Plaintiff reported that he had stopped taking Lamictal, Venlafaxine, and Trazodone and experienced no change aside from increased anger. (*Id.*). Dr. Dawood noted that Plaintiff appeared tense and unhappy with a flat affect. (*Id.*). He noted that Plaintiff was stable with chronic symptoms and he asked Plaintiff to see a therapist. (Tr. 380). He discontinued Lamictal, Trazodone, and Effexor, and prescribed Seroquel. (*Id.*).

On August 11, 2012, Dr. Dawood completed an additional Mental Residual Functional Capacity Questionnaire form. (Tr. 383–87). Dr. Dawood noted that Plaintiff was unable to meet competitive standards in: remembering work-like procedures; maintaining regular attendance; sustaining an ordinary routine without being unduly distracted; making simple work-related decisions; performing at a consistent pace without an unreasonable number and length of rest periods; and accepting instructions and responding appropriately to criticism. (Tr. 385). Dr. Dawood checked the box indicating that Plaintiff would miss more than four days of work per month. (Tr. 387). He noted that Plaintiff was not a malingerer and that his impairments had lasted or could be expected to last for at least 12 months. (*Id.*). Dr. Dawood also checked the box stating that Plaintiff could not engage in full-time competitive employment on a sustained basis. (*Id.*).

## III. DISCUSSION

### A. Standard of Review

■ This Court has jurisdiction to review the final decision of the Commission-

er under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

■ Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also sub-

stantial evidence for the plaintiff's position. *See Perez v. Chater,* 77 F.3d 41, 46–47 (2d Cir.1996).

■ Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988).

## B. Determining Disability Under the Social Security Act

The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin,* No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

■ The burden is on the claimant to demonstrate that she is disabled within the meaning of the Act. *See Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determina-

tion at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

## C. Analysis of ALJ's Determination

### 1. Step One

In applying the five-step sequential analysis at the first step, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since November 1, 2009, the alleged onset date. (Dkt. 1–2 at 7). The parties do not contest this determination and it is supported by substantial evidence.

### 2. Step Two

At the second step, the ALJ found that Plaintiff had the following severe impairments: obesity, depression, anxiety, and bipolar disorder. (Id.). The ALJ also noted that Plaintiff had asthma, but found this to be an impairment that caused only minimal, if any, functional limitations because Plaintiff treated the condition in a "conservative manner." (Id.). Plaintiff testified that his condition was impacted by the weather, and so the ALJ adopted the RFC to limit exposure to humidity, extremes in temperature, and wetness. (Id. at 7–8). Plaintiff does not contest the ALJ's step two findings, and they appear to be supported by substantial evidence.

### 3. Step Three

At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render him disabled. (Dkt. 1–2 at 8). Specifically, the ALJ considered Listings 12.04, 12.06, and 12.11. (Id.). Plaintiff does not contest the ALJ's findings at step three, and it appears that the ALJ's findings were supported by substantial evidence.

### 4. Step Four

At the fourth step, the ALJ determined Plaintiff's residual functional capacity to perform work. (Dkt. 1–2 at 9). The ALJ concluded that plaintiff had the following RFC:

> [t]o perform medium work, as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except he is limited to simple routine and repetitive tasks; he requires low stress work, defined as no production paced work, occasional changes to work

setting, occasional use of judgment, and occasional decision making; he is limited to occasional and superficial interaction with coworkers and supervisors; he should have no interaction with the public; he should have no exposure to hazards; and he should have no more than frequent exposure to humidity, extremes in temperature, and wetness.

(Id. at 9).

### a. Substantial Evidence

#### i. Dr. Dawood

■ Plaintiff contends that the ALJ failed to evaluate the opinions of treating psychiatrist Dr. Dawood pursuant to the appropriate legal standards. (Dkt. 7–1 at 16). Plaintiff argues that the ALJ failed to provide good reasons for rejecting Dr. Dawood's treating physician opinion because the ALJ: (1) discounted Dr. Dawood's opinion with Dr. Dawood's own treatment notes; (2) relied on GAF scores; and (3) did not apply the factors contained in § 404.1527(c). (Dkt. 7–1 at 15–16). The Commissioner argues that Dr. Dawood's opinions were more restrictive than medical evidence in the record supported, and that the ALJ did account for many of Dr. Dawood's functional assessments in her RFC finding. (Dkt. 9–1 at 20).

■ Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations...." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The "treating physician rule" requires the ALJ to give "controlling weight" to the opinion of a claimant's treating physician regarding "the nature and severity of [the claimant's] impairment(s) ... [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). As explained by the Second Circuit Court of Appeals:

An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various "factors" to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). An ALJ does not have to explicitly walk through these factors, so long as the Court can "conclude that the ALJ applied the substance of the treating physician rule ... and provide[d] 'good reasons' for the weight she gives to the treating source's opinion." *Id.*

■ "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Id.*

Here, ALJ Wakshul stated that she had reviewed the medical source statements provided by Dr. Dawood and gave them "little weight" because they "conflict with Dr. Dawood's own clinical notes that show the claimant is experiencing symptoms, but not at a disabling level." (Dkt. 1–2 at 11). The ALJ noted that Dr. Dawood's

treatment notes in the record continually assigned Plaintiff GAF scores "in the 55–60 range with associated clinical notes documenting flat [affect], glum presentation, but with his overall mental faculties intact." (*Id.*). The ALJ referred to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM–IV"), which stated that a GAF score between 51 and 60 was indicative of no more than "moderate symptoms." (*Id.* at 11–12). The ALJ found that these scores were also consistent with "the totality of the evidence adduced" because the record showed that Plaintiff was experiencing depression, anxiety, and some manic symptoms from bipolar disorder, but was not exhibiting symptoms that were "cumulatively disabling." (*Id.* at 12).

### Treatment Notes

■ "While an ALJ 'may not reject a treating physician's opinion based "solely" on internal conflicts in that physician's clinical findings,' the ALJ also found [Dr. Dawood's] opinion to be inconsistent with the findings of [Dr. Kamin], the consultative physician." *Vanterpool v. Colvin,* No. 12–CV–8789(VEC)(SN), 2014 WL 1979925, at *16 (S.D.N.Y. May 15, 2014) (quoting *Lamond v. Astrue,* 440 Fed.Appx. 17, 21 (2d Cir.2011)). Accordingly, the ALJ did not err in considering the inconsistencies in Dr. Dawood's treatment notes and opinions in assigning Dr. Dawood's opinions less weight.

Further, it is worth noting that the opinions of Dr. Dawood were essentially "form reports composed of checklists and fill-in-the-blank statements." *Gray v. Astrue,* No. 09–CV–00584, 2011 WL 2516496, at *5 (W.D.N.Y. June 23, 2011). Form reports of this sort are, by their nature, of limited evidentiary value. *See id.* (citing *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir. 1993)). Although Dr. Dawood checked boxes on his form statements, he rarely if

ever provided support for his responses, even when prompted to elaborate on his opinions. (Tr. 287–92). *See Montaldo v. Astrue,* No. 10 Civ. 6163(SHS), 2012 WL 893186, at *15 (S.D.N.Y. Mar. 15, 2012) (finding the ALJ's determination that the treating physician's responses to a questionnaire were inconsistent with her own evaluations of the plaintiff's day-to-day activities was one good reason for not giving the opinion of the treating physician controlling weight).

### GAF Scores

■ Plaintiff argues that the ALJ improperly relied on Plaintiff's GAF score, which is no longer used by Volume V of the DSM. (Dkt. 7–1 at 20). Admittedly, "as a global reference intended to aid in treatment, a GAF score does not itself necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to work." *Beck v. Colvin,* No. 6:13–CV–6014 (MAT), 2014 WL 1837611, at *10 (W.D.N.Y. May 8, 2014) (quotation omitted). In addition, "[t]he ALJ ... is not permitted to 'rely on any test score alone. No single piece of information taken in isolation can establish whether [a claimant has] a marked or an extreme limitation in a domain.'" *Walterich v. Astrue,* 578 F.Supp.2d 482, 513 (W.D.N.Y. 2008) (quoting 20 C.F.R. § 416.926a(e)(4)(i)).

■ Here, the ALJ did not rely on Plaintiff's GAF scores alone to find that Dr. Dawood's opinions were inconsistent with his treatment notes; rather, the ALJ stated that the GAF scores were consistent with Dr. Dawood's treatment records as a whole indicating that Plaintiff experienced depression, anxiety, and some manic symptoms from bipolar disorder, but did not exhibit symptoms that were cumulatively disabling. (Dkt. 1–2 at 12). Further, the ALJ was permitted to consider Plaintiff's GAF scores as part of her analy-

sis because Volume IV was in effect at the time of Plaintiff's treatment. *See Tremblay v. Colvin,* No. 12–CV–0379(MAT), 2014 WL 4745762, at *4 n. 2 (W.D.N.Y. Sept. 23, 2014).

"The GAF scale indicates the clinician's overall judgment of a person's level of psychological, social, and occupational functioning. The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest." *Id.* at *4. "A GAF of 51–60 [indicates] moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (*e.g.,* few friends, conflicts with peers or co-workers)." *Shaw v. Colvin,* No. 12–CV–0822A, 2015 WL 1646998, at *4 (W.D.N.Y. Apr. 14, 2015) (quotation omitted). ALJ Wakshul noted that Plaintiff was consistently rated as having a GAF of 55, which indicates that Dr. Dawood believed Plaintiff had moderate symptoms associated with functional limitations. This finding, supported by Dr. Dawood's treatment notes that Plaintiff had a "glum" appearance and "chronic" condition but was "stable," contradicts Dr. Dawood's medical source statements that Plaintiff was totally disabled and unable to work.

### Factors

■ Plaintiff argues that ALJ Wakshul erred in applying the factors of § 404.1527(c). (Dkt. 7–1 at 16–15). Specifically, Plaintiff contends that the ALJ failed to "consider the treatment relationship between Dr. Dawood and Plaintiff, Dr. Dawood['s] specialty as a psychiatrist, and the consistency with the record as a whole." (Dkt. 7–1 at 23).

This argument must fail. The ALJ referenced Dr. Dawood numerous times in her decision in connection with his psychiatric treatment of Plaintiff. (Dkt. 1–2 at

10–13). There is no support for the suggestion that the ALJ did not consider that Dr. Dawood was a treating psychiatrist. In addition, the ALJ explicitly stated that she found Dr. Dawood's opinions to conflict with his own treatment notes as well as the "totality of the evidence adduced." (*Id.* at 12).

The ALJ provided enough detail in her decision that the Court can deduce "good reasons" for her decision to afford Dr. Dawood's opinions that Plaintiff was unable to work "little weight."

### ii. Dr. Kamin

Plaintiff argues that the mental RFC is not supported by substantial evidence because the ALJ improperly relied upon the "stale" opinion of non-examining and non-treating State agency medical consultant Dr. Kamin. (Dkt. 7–1 at 25–27). The Commissioner maintains that it was appropriate for the ALJ to give "great weight" to the opinion of this reviewing physician because the opinion was supported by the medical evidence. (Dkt. 9–1 at 20).

Under 20 C.F.R. § 416.927(e)(2)(i):

State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence . . . .

"[W]hen there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" *Harris v. Astrue,* No. 07–CV–4554 (NGG), 2009 WL 2386039, at *14

(E.D.N.Y. July 31, 2009) (quoting *Cruz v. Sullivan,* 912 F.2d 8, 13 (2d Cir.1990)). "The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record." *Frye ex rel. A.O. v. Astrue,* 485 Fed.Appx. 484, 487 (2d Cir.2012).

Here, Dr. Kamin's report was more consistent with Dr. Dawood's treatment records than Dr. Dawood's own opinions. Because the ALJ found Dr. Kamin's report to be consistent with the treatment records, she afforded the opinion "great weight." (Dkt. 1–2 at 12). *See Smith v. Colvin,* 17 F.Supp.3d 260, 268 (W.D.N.Y.2014) ("[T]he opinions of consulting sources 'may constitute substantial evidence if they are consistent with the record as a whole.'") (quoting *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 79 (N.D.N.Y.2005)); *Vanterpool,* 2014 WL 1979925, at *16 (finding the ALJ did not err in affording greater weight to the opinion of the consultative physician where the opinion was more consistent with the treating physician's medical records). Despite assigning Dr. Kamin's opinion great weight, ALJ Wakshul incorporated additional limitations in her RFC to accommodate Plaintiff's social functioning, concentration and memory, and anger and anxiety in accordance with Plaintiff's testimony. (Dkt. 1–2 at 12).

Plaintiff contends that Dr. Kamin's opinion was provided on November 7, 2011, and was therefore made prior to the submission of a large portion of medical evidence in the record, including Dr. Dawoods' August 2012 opinion as well as Dr. Goodrich's treatment summary. (Dkt. 7–1 at 25–26).

It is true that medical source opinions that are "conclusory, stale, and based on an incomplete medical record" may not be substantial evidence to support an ALJ finding. *Griffith v. Astrue,* No. 08–CV–

6004, 2009 WL 909630, at *9 n. 9 (W.D.N.Y. July 27, 2009). Here, although Dr. Kamin's opinion was based on only part of the overall administrative record, the treatment notes and opinions in the record before and after Dr. Kamin's opinion demonstrate substantially similar limitations and findings.

Dr. Goodrich's treatment summary contained information about Plaintiffs treatment history, and this information was largely incorporated into Dr. Dawood's treatment notes, which were available to Dr. Kamin. (Tr. 388–89). Dr. Dawood's August 11, 2012 opinion largely mirrored his June 22, 2011 opinion, which was provided to Dr. Kamin for review. (Tr. 301–18, 373–78, 382–87). As a result, there was no significantly new medical evidence produced after Dr. Kamin's opinion that would have likely impacted Dr. Kamin's opinion. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir.2010) (finding harmless error where the ALJ's consideration of a doctor's report would not have changed the ALJ's adverse determination).

Given this particular administrative record and the circumstances of this case, the ALJ did not err when she assigned "great weight" to the medical source statement provided by Dr. Kamin but "little weight" to the opinions of Dr. Dawood.

### b. Credibility Determination

Plaintiff argues that the ALJ failed to follow the appropriate legal standard when evaluating Plaintiff's credibility. (Dkt. 7–1 at 27).

The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Brownell v. Comm'r of Soc. Sec.*, No. 1:05–CV–0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Dec. 28, 2009). First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

In the instant case, the ALJ properly applied the two step analysis. First, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms. (Dkt. 1–2 at 10). Second, the ALJ determined that Plaintiffs "allegations of disability" were "not entirely credible in light of inconsistent statements." (*Id.* at 12).

First, Plaintiff contends that the ALJ improperly found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" because this improperly meant the ALJ based her credibility determination on her own RFC finding. (Dkt. 7–1 at 27 (quoting Dkt. 1–2 at 10)).

This argument has been rejected by this Court. *See Diakogiannis v. Astrue*, 975 F.Supp.2d 299, 318–19 (W.D.N.Y. 2013) (determining the ALJ's credibility assessment was supported by substantial evidence where the ALJ assessed the plaintiff's subjective complaints "in the context of a comprehensive review of the entire medical record," despite the use of

the boilerplate language that the plaintiffs complaints were "inconsistent with the above residual functional capacity"); *Luther v. Colvin,* No. 12–CV6466, 2013 WL 3816540, at *7–8 (W.D.N.Y. July 22, 2013) (finding ALJ properly assessed plaintiff's credibility despite boilerplate language in opinion that plaintiff's alleged symptoms were "inconsistent with the above residual functional capacity"). Courts in this Circuit have stated that it is inappropriate for an ALJ to base his or her credibility determination "solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding." *Burton v. Colvin,* No. 6:12–CV6347(MAT), 2014 WL 2452952, at *11 (W.D.N.Y. June 2, 2014). "Read in context, however, this statement does not [necessarily] indicate that the RFC assessment was a basis for a finding of lack of credibility." *Briscoe v. Astrue,* 892 F.Supp.2d 567, 585 (S.D.N.Y. 2012); *see also Abdulsalam v. Comm'r of Soc. Sec.,* No. 5:12–CV1632(MAD), 2014 WL 420465, at *7 (N.D.N.Y. Feb. 4, 2014) ("this erroneous boilerplate language does not merit remand if the ALJ offers specific reasons to disbelieve the claimant's testimony") (internal quotation omitted).

 In the instant case, Plaintiff takes the ALJ's boilerplate language out of context. "[I]t is not sufficient for an ALJ to merely state that he finds the claimant incredible to the extent that her complaints are inconsistent with his RFC determination ... though, '[f]ailure to *expressly* consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination.'" *Kunkel v. Comm'r of Soc. Sec.,* No. 12–CV–6478, 2013 WL 4495008, at *3 (W.D.N.Y. Aug. 20, 2013) (quoting *Wischoff v. Astrue,* No. 08–CV–6367, 2010 WL 1543849, at *7 (W.D.N.Y. Apr. 16, 2010)).

 Here, the ALJ properly explained why she found that Plaintiff's testimony was not entirely credible because the ALJ did expressly consider Plaintiff's testimony as well as the objective medical evidence, Plaintiffs activities of daily living, medications, treatment history, and the opinions of treating and non-treating physicians. (Dkt. 1–2 at 9–13). For example, ALJ Wakshul found that Plaintiff's daily activities did not show an individual who was incapable of all work activity. (*Id.* at 19). Plaintiff testified that he played video games online and socialized on the internet. (*Id.*). Further, Plaintiff testified that his physicians stopped prescribing medicines in July 2012, but the record demonstrates that Plaintiff stopped taking his medications at that time and his physician then discontinued prescribing them. (*Id.*). As discussed further below, the medical evidence in the record did not support that Plaintiff experienced memory impairments to the extent he alleged, and ALJ Wakshul noted that in her decision. (*Id.*). Despite the use of boilerplate language, the ALJ thoroughly discussed Plaintiff's testimony and the evidence in the medical record that the ALJ believed contradicted Plaintiff's testimony.

Second, Plaintiff argues that the ALJ did not consider the requisite factors in evaluating Plaintiff's credibility. (Dkt. 7–1 at 28).

In evaluating a plaintiffs credibility, the ALJ must consider several factors including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Stewart v. Barnhart*, 235 F.R.D. 579, 590 (W.D.N.Y.2006); *see* 20 C.F.R. § 404.1529(c). Plaintiff specifically argues that the ALJ failed to properly discuss Plaintiff's "multiple medication and dosage changes in response to Plaintiff's unremitting symptoms" and "failed to account for Plaintiff's memory impairments and fatigue or lack of energy." (Dkt. 7-1 at 28–29).

Contrary to Plaintiff's argument, ALJ Wakshul did discuss the varied medications that Plaintiff was prescribed, including Lexapro, Albuterol nebulizer, Primatine inhaler, Risperdal, Wellbutrin, Seroquel, Lamictal, Trazodone, Effexor, Adderall, and Cymbalta. (Dkt. 1-2 at 10–11). The ALJ noted that Plaintiffs physicians were adjusting his medications, and that Plaintiff had stopped taking Lamictal, Trazodone, and Effexor of his own accord. (*Id.* at 11). The ALJ also found noteworthy the fact that Plaintiff testified he experienced no side effects from Adderall and found that it gave him more energy and motivation. (*Id.*). The Court finds that this discussion of Plaintiffs medication history is

more than sufficient to satisfy the requisite credibility factor.

The record does not support a finding that Plaintiff had memory impairments. Dr. Dawood and Dr. Sirotenko each found that Plaintiff had fair attention and concentration, and Dr. Kamin opined that Plaintiff could sustain attention and concentration for low stress work. (Tr. 289, 317). Dr. Kamin noted that Plaintiff had performed "both serial threes and serial sevens with no mistakes." (Tr. 317). In any event, ALJ Wakshul specifically addressed Plaintiffs concerns about his concentration and memory in formulating her RFC, stating: "I incorporated limits to minimize distractions to the claimant's concentration and memory by limiting him to simple routine and repetitive tasks...." (Dkt. 1-2 at 12).

As for Plaintiff's alleged fatigue or lack of energy, the fact that the ALJ did not explicitly address these concerns does not mean that they were not considered. *See Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir.2013) (declining to adopt rule that an ALJ must expressly discuss a claimant's capacity to perform each work-related function, noting "[t]he relevant inquiry is whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence."). Even if the ALJ had explicitly addressed Plaintiff's allegations of fatigue, these impairments would not likely impact the ultimate finding of the ALJ that Plaintiff was not disabled within the meaning of the Act. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

Third, Plaintiff argues that the ALJ incorrectly identified an inconsistency in the record when Plaintiff testified "that he was

fired from his last job because he missed four days as a baker's assistant, indicative that he is capable of work since his symptoms did not cause his termination." (Dkt. 7–1 at 29 (citing Dkt. 1–2 at 12)). Plaintiff argues that there is substantial evidence in the record that his absenteeism is related to his conditions, and there is a connection between his conditions and his loss of former employment. (*Id.*).

"[W]hether there is substantial evidence supporting the [plaintiff's] view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B. v. Colvin,* 523 Fed.Appx. 58, 59 (2d Cir.2013). "The ALJ 'has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment ... [which he must do] in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant.'" *King v. Astrue,* No. 12–CV–6186T, 2013 WL 3154129, at *8 (W.D.N.Y. June 21, 2013) (quoting *Mimms v. Heckler,* 750 F.2d 180, 186 (2d Cir.1984)) (alteration in original).

Here, there is substantial evidence, including Plaintiff's own testimony, to support that he left his most recent job as a result of conflicts with other employees and absenteeism. Further, the record and Plaintiff's testimony demonstrated that Plaintiff was referred to VESID by mental health providers but failed to follow through to apply. "Just as a good work history may be deemed probative of credibility, a poor work history may prove probative as well." *Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998); *see also Webb v. Astrue,* No. 3:11–CV–94(GLS), 2012 WL 589660, at *4 (N.D.N.Y. Feb. 22, 2012) (stating it was proper for ALJ to consider Plaintiff's poor work history); *Outley v. Astrue,* No. 5:09–CV–0141(FJS/VEB), 2010 WL 3703065, at *9 (N.D.N.Y. Aug. 26, 2010) (same). Because the ALJ was permitted to consider Plaintiff's sparse work record in assessing Plaintiff's credibility, the ALJ did not commit a reversible legal error. To the extent Plaintiff argues this evidence should have been weighed differently, that is not a proper consideration for this Court. *See Serra v. Sullivan,* 762 F.Supp. 1030, 1034–35 (W.D.N.Y.1991) ("It is the [ALJ's] function not the district court's to appraise the credibility of witnesses, including the plaintiff.").

### 5. Step Five

The ALJ then proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed Plaintiff's job qualifications by considering his physical ability, age, and education. (Dkt. 1–2 at 13). At the time of the alleged onset date, Plaintiff was 21 years old and he had a high school education, although he had no relevant past work. (*Id.*). Second, the ALJ determined whether there were jobs existing in the national economy that a person with Plaintiff's qualifications and RFC could perform. (*Id.* at 13–14). ALJ Wakshul found that Plaintiff's ability to perform work at all exertional levels was "impeded" by Plaintiff's nonexertional limitations. (*Id.* at 13). ALJ Wakshul relied on the testimony of VE DiStefano to find that there were jobs in the economy that Plaintiff was capable of performing, such as laundry worker, hand packer, and mail clerk. (*Id.* at 14).

At step five of the analysis, the burden shifts to the Commissioner to demonstrate that there are a substantial number of jobs available in the national economy for Plaintiff to perform. *Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir.1998). The Commissioner will utilize the Medical Vocational Guidelines or "Grids" found at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Pratts v. Chater,* 94 F.3d 34, 38–39 (2d Cir.1996). However, "if a claimant has

nonexertional impairments which 'significantly limit the range of work permitted by his exertional limitations,' then the Commissioner cannot rely upon the grids, and instead 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform.'" *Griffith v. Astrue*, No. 08–cv–6004 CJS, 2009 WL 909630, at *4 (W.D.N.Y. Mar.31, 2009) (citing *Pratts*, 94 F.3d at 39).

■ Having properly determined Plaintiff's residual functional capacity, "[the ALJ] did not err in using that residual functional capacity to determine (with the help of a vocational expert) whether jobs existed in the national economy" that Plaintiff could perform. *Pellam v. Astrue*, 508 Fed.Appx. 87, 91 (2d Cir.2013); *see also Ridgeway v. Colvin*, No. 12–CV–6548T, 2013 WL 5408899, at *10 (W.D.N.Y. Sept. 25, 2013) ("Because there is substantial evidence in the record to support the ALJ's assessment of Plaintiff's RFC, the ALJ is entitled to rely on the vocational expert's testimony that Plaintiff could perform other jobs that exist in significant numbers in the national economy."). Accordingly, the ALJ did not err in relying on the testimony of the vocational expert as well as Plaintiff's age, education, work experience, and RFC in concluding that Plaintiff was not disabled within the meaning of the Act.

## IV. CONCLUSION

The Court has considered Plaintiff's remaining arguments and finds them to be without merit. For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 9) is granted, and Plaintiff's motion for judgment on the

pleadings (Dkt. 7) is denied. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.