Martha **CONLIN** o/b/o N.T.C.B.,
Plaintiff,

v.

Carolyn W. **COLVIN**, Acting Commissioner of Social Security, Defendant.

No. 6:14–CV–6362 EAW.

United States District Court, W.D. New York.

Signed June 29, 2015.

Jaya Ann Shurtliff, Stanley Law Offices, Syracuse, NY, for Plaintiff.

David L. Brown, Joanne Jackson, Social Security Administration, New York, NY, Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

Plaintiff Martha Conlin o/b/o N.T.C.B. ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for supplemental security income. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") David S. Pang was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 9, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and Plaintiffs motion (Dkt. 9) is denied. Plaintiffs complaint is dismissed with prejudice.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On August 16, 2011, Plaintiff protectively filed an application for supplemental security income on behalf of claimant. (Administrative Transcript (hereinafter "Tr.") 49, 148–54). Plaintiff alleged a disability onset date of February 1, 2011. (Tr. 148). In her application, Plaintiff alleged that N.T.C.B. suffered from the following disabilities: Attentional Deficit Hyperactivity Disorder ("ADHD"), learning disorder, and Oppositional Defiance Disorder ("ODD"). (Tr. 157). The Commissioner denied Plaintiff's application, and Plaintiff requested a hearing by an ALJ on November 14, 2011. (Tr. 57–59).

On December 27, 2012, Plaintiff, represented by counsel, testified at a hearing via videoconference before ALJ Pang. (Tr. 9–42). On February 22, 2013, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 14–26).

On June 9, 2014, the Appeals Council denied Plaintiffs request for review, making the ALJ's decision the final decision of the Commissioner. (Dkt. 1–2 at 2–5). On July 1, 2014, Plaintiff filed this civil action appealing the final decision of the Commissioner. (Dkt. 1).

### B. Medical Evidence

At the time of his application, N.C.T.B. was five years old. (Tr. 148). N.T.C.B. was initially seen by Dr. Naomi Yachele-

vich of the Division of Genetics at Strong Memorial Hospital on September 24, 2010, for behavioral concerns and developmental delay. (Tr. 203–18). Treatment notes indicate that at the time of this visit N.T.C.B. had ADHD and a history of global developmental delay, though he attended a regular classroom. (Tr. 203). Further evaluation by Dr. Yachelevich found N.T.C.B. to be cooperative, not in acute distress, and able to engage in comprehensible sentences. (Tr. 205).

Dr. Yachelevich saw N.T.C.B. again on June 30, 2011 for inattention, inability to focus, and aggressive behavior at home. (Tr. 199). At the time of this visit, N.T.C.B. was prescribed both Adderall and Guanfacine extended release and had an Individualized Educational Plan ("IEP"), which included a summer program, occupational and speech therapy, and math support to combat his condition. (Id.). Dr. Yachelevich again noted that N.T.C.B. was cooperative, not in acute distress, and able to engage in comprehensible sentences. (Tr. 202). Dr. Yachelevich could not determine the etiology of any developmental or behavior concerns and accordingly recommended a referral to a child development specialist. (Id.).

N.T.C.B. was later seen by consultative examiner Dr. M. Raqib Raja on August 5, 2011, who confirmed the diagnosis of ADHD and also diagnosed ODD. (Tr. 219–21). Ms. Conlin reported to Dr. Raja that her son did not listen to her, threw temper tantrums, and told her "you are not my boss" and "I'm not going to listen to you," though she further stated that "he is generally happy at home and school, and has no difficulty making friends." (Tr. 222). Dr. Raja's notes indicated that N.T.C.B. was "quite verbal" and "easy to engage" during the interview. (Tr. 220). N.T.C.B.'s psychomotor activity was noted to be relatively neutral and there was "no

evidence of gross excessive motor activity or fidgetiness." (Tr. 220–21). N.T.C.B.'s speech was "fairly clear" with "good volume and rhythm." (Tr. 221). Dr. Raja described N.T.C.B.'s overall cognitive skills as in the average range, but did find poor insight and impulsive judgment, and recommended ruling out that N.T.C.B. suffered from reading and mathematical learning disorders. (Id.).

State agency mental health expert, Dr. J. Randall, evaluated N.T.C.B. on September 28, 2011. (Tr. 309–14). Using the six domains of functioning provided at 20 C.F.R. § 416.926(a), Dr. Randall found that N.T.C.B. had a marked limitation in "Acquiring and Using Information," while noting that N.T.C.B. was receiving academic intervention services in school. (Tr. 311). Dr. Randall also found that N.T.C.B. had a less than marked limitation in "Attending and Completing Tasks." (Id.). Dr. Randall noted that N.T.C.B.'s teacher characterized N.T.C.B.'s effort as inconsistent, but also considered that Dr. Yachelevich's June 2011 psychiatric exam showed organized thoughts and no evidence of hyperactivity. (Id.). A less than marked limitation was also found for "Interacting and Relating with Others". (Id.). Dr. Randall noted that N.T.C.B.'s mother reported that N.T.C.B. had no trouble making friends and was described as verbally easy to engage at Dr. Yalchelevich's June 2011 evaluation. (Id.). Finally, a less than marked limitation was found for "Moving About and Manipulating Objects." (Id.). Dr. Randall noted that N.T.C.B. ran well, knew how to ride a bike, and could use utensils to eat. (Tr. 312). No limitations were found in the domains of "Caring For Yourself" and "Health and Physical Well-Being." (Id.). Dr. Randall concluded that although the claimant had severe mental impairments, his limitations did not meet, medically equal, or functionally

equal any applicable listing in 20 C.F.R. Pt. 404, Subpt. P, App 1. (Tr. 309).

School psychologist Emily Darrow Meisch conducted a psychological evaluation of N.T.C.B. on December 2, 2011. (Tr. 429–33). This report included a parental interview, review of N.T.C.B.'s record, classroom observation, and the Woodcock Johnson Tests of Cognitive Abilities and Achievement, 3rd editions. (Tr. 429). Ms. Meisch noted that N.T.C.B. was pleasant and cooperative during testing, engaged the examiner, and showed adequate attention and concentration, though needed to be reminded to work independently. (Tr. 430). The summary of Ms. Meisch's report noted that even though N.T.C.B. performed within the average range of all areas of academic standardized testing except for short term memory, N.T.C.B. continued to perform below average in curriculum based measures of academics. (Tr. 433). Ms. Meisch stated it was "unclear" whether this underperformance was due to ADHD, lack of motivation, a learning disability, or a speech/language impairment. (*Id.*). Ms. Meisch concluded that the committee on special education should consider a more intensive academic intervention to address focusing and independent work skills, including giving N.T.C.B. more time to complete tasks in a location with minimal distractions. (*Id*).

### C. Non–Medical Evidence

N.T.C.B.'s teacher, Ms. Granbois, filled out progress reports for the second, third, and fourth periods of the 2010–2011 school year. (Tr. 458–59). During the second period, Ms. Granbois noted that N.T.C.B, was starting to share with his peers but that N.T.C.B.'s behavior had regressed since December, particularly when he was angry at someone or frustrated because an assignment was too challenging. (Tr. 458). Ms. Granbois also indicated that N.T.C.B. often talked over the teacher, went off-topic when asked questions, and was struggling with many classroom tasks. (*Id.*). Progress notes in the third period indicated that N.T.C.B. was still struggling to keep attention on tasks and was easily distracted by others, though he did show improvement in not disrupting his peers and teachers when they were talking. (*Id.*). The fourth period progress notes indicated that N.T.C.B. was a "nice friend" and was "very caring" toward his teachers. (Tr. 459). Ms. Granbois commented that N.T.C.B. had been putting forth "good effort" but was still struggling to learn certain curriculum. (*Id.*). Ms. Granbois further indicated that N.T.C.B. had improved at following rules and transitioning, and was refusing to complete tasks less. (*Id.*).

On March 11, 2011, Ms. Granbois wrote a letter to Dr. Bjorseth, N.T.C.B.'s primary care physician. (Tr. 192). Ms. Granbois indicated that N.T.C.B. had struggled with the kindergarten curriculum and in socializing appropriately with peers. (*Id.*). Ms. Granbois stated that N.T.C.B.'s attitude toward school and classmates changed daily, and that it would often take numerous attempts to get N.T.C.B. to transition from one activity to another. (*Id.*). When frustrated, N.T.C.B. would "shut down, cry, or refuse the task," (*Id.*). The letter further indicated that N.T.C.B. was having difficulty remaining quiet throughout the day, talked constantly while the teacher was giving directions, and would often not participate or pay attention during activities. (*Id.*).

On July 22, 2011, N.T.C.B. was seen by Kim Bautista, a licensed clinical social worker. (Tr. 340–49). Ms. Bautista noted that N.T.C.B. presented with significant ADHD symptoms, including hyperactivity, impulsivity, and attentional difficulties. (Tr. 340). Ms. Bautista indicated that N.T.C.B.'s mother was concerned about

behavioral difficulties, including physical outbursts, but that these decreased with the medicine N.T.C.B. had been prescribed. (*Id.*). Ms. Bautista also recorded that N.T.C.B. had academic performance and classroom behavior problems. (*Id.*). Upon examination, Ms. Bautista noted that N.T.C.B. was cooperative, had appropriate affect, euthymic mood, spontaneous speech, and focused thought form. (Tr. 347). Ms. Bautista further noted that N.T.C.B.'s mother reported problems with impulse control. (Tr. 348). The report concluded that N.T.C.B.'s emotional and behavioral difficulties were triggered in part by ADHD symptoms. (Tr. 348–49).

N.T.C.B.'s mother completed a function report on August 16, 2011. (Tr. 167–74). She noted that N.T.C.B. had problems speaking clearly. (Tr. 169). With respect to communicating, she responded that N.T.C.B. asked a lot of what, why, and where questions, used complete sentences most of the time, talked about what he was doing, conversed with other children, and told stories, but did not ask for what he wanted and could not deliver simple messages. (Tr. 170). N.T.C.B.'s mother reported that N.T.C.B. could recite up to ten numbers, count three objects, identify colors and shapes, define common words, knew his age and birthday, and asked what words meant. (Tr. 171). However, she indicated that N.T.C.B. did not know his telephone number, and could not read capital letters of the alphabet or understand a joke. (*Id.*). N.T.C.B.'s mother also indicated that N.T.C.B.'s physical abilities were not limited. (Tr. 172). She further stated that N.T.C.B. enjoyed being with people, showed affection, and played well with other children, but struggled with sharing toys and taking turns. (*Id.*). Next, she stated that N.T.C.B. could take care of various daily habits and personal needs, but needed some help to dress, wash, and bathe. (*Id.*). Finally,

N.T.C.B.'s mother indicated that N.T.C.B. had limited ability to pay attention, stick to a task, or focus on certain activities for a long period of time. (*Id.*).

A teacher questionnaire was signed by Peggy Wilson, RN, on August 23, 2011, though the record is unclear as to who completed this form. (Tr. 415–422). In the domain of acquiring and using information, the questionnaire indicated that N.T.C.B. had a "very serious problem" in all aspects considered on the questionnaire. (Tr. 416). It was further noted that N.T.C.B. had difficulty reading, listening to oral stories, and answering comprehension questions. (*Id.*). With respect to attending and completing tasks, the questionnaire rated N.T.C.B. as having a "very serious problem" for 7 out of 13 tasks, a "serious problem" on two tasks, an "obvious problem" on one task, and a "slight problem" on three tasks. (Tr. 417). For interacting and relating with others, N.T.C.B. was marked as having very serious problems for seven indicators, serious problems for four, obvious problems for one, and slight problems for two. (Tr. 418). N.T.C.B was also marked for having only a slight problem for moving about and manipulating objects, and anywhere from "no problem" to a "very serious problem" in various indicators of caring for himself. (Tr. 419–20).

On November, 7, 2011, school counselor John Bittner observed N.T.C.B. in his classroom during a reading group discussion. (Tr. 423). Mr. Bittner noted that N.T.C.B. raised his hand frequently and appropriately, responded well to the teacher, was prepared for class, and "seemed willing to learn and accept feedback." (*Id.*). Mr. Bittner further opined that N.T.C.B. was "not a distraction" in the classroom and "sat quietly and did what he was asked." (Tr. 424).

Ms. Bautista reviewed N.T.C.B.'s diagnosis on July 24, 2012, and identified his condition as a combination of ADHD, ODD, as well as math and reading disorders. (Tr. 368–70). On September 26, 2012, Ms. Bautista also completed a Medical Source Statement indicating that N.T.C.B.: (1) often failed to pay close attention to details; (2) had difficulty sustaining attention in work and play; (3) did not seem to listen when spoken to directly; (4) often did not follow through on instructions and failed to finish tasks; (5) often had difficulty organizing tasks and activities; (6) often avoided, disliked, or was reluctant to engage in tasks that require sustained mental effort; (7) often lost things; (8) was easily distracted by extraneous stimuli; and (9) was often forgetful. (Tr. 371). N.T.C.B. was also noted for severe inattention, impulsiveness, and hyperactivity, as well as marked limitations in: (1) cognitive/communicative function; (2) social functioning; (3) personal functioning; and (4) maintaining concentration, persistence, or pace. (Tr. 371–73). Ms. Bautista further opined that N.T.C.B. was markedly limited in the domains of acquiring and using information, attending and completing tasks, and caring for self, and that N.T.C.B. was moderately limited in interacting and relating with others. (Tr. 373).

**D. Hearing Testimony**

At the time of the administrative hearing, N.T.C.B. was seven years old and in the second grade. (Tr. 148). Plaintiff testified that N.T.C.B. was seeing Dr. Raja for medication, and was diagnosed with ADHD, ODD, and a learning disability. (Tr. 38). Plaintiff also stated that N.T.C.B. was on an IEP, which his teachers wanted to continue for the following year, and received speech and occupational therapy as well as TouchMath help. (Id.). Plaintiff further indicated that N.T.C.B. could not sit still or stay focused at home, and that N.T.C.B's teachers had told her that he could not stay focused at school. (Id.).

According to Plaintiff, N.T.C.B. was in a classroom that had both a regular teacher as well as a special education teacher. (Tr. 39). Plaintiff further testified that N.T.C.B. received special services both in a regular classroom and in a separate classroom in a small group setting. (Id.). Plaintiff stated that N.T.C.B. struggled with reading, required extra time for tests, and worked with an occupational therapist who helped him with fine motor skills and a speech therapist who taught him proper pronunciation and punctuation. (Tr. 40). Plaintiff also stated that N.T.C.B. was seeing a counselor a couple of times per month, and that she believed the counselor was a big help to N.T.C.B. (Tr. 44). Plaintiff reported that N.T.C.B. had been prescribed Strattera, Concerta, and Claritin. (Tr. 41). Plaintiff stated that N.T.C.B. had experienced no side effects from this medication, but she did not believe that the medication was helping his ADHD. (Tr. 41–42).

Plaintiff testified that N.T.C.B. got along okay with adults, and got along okay, "to a certain extent," with children his own age. (Tr. 42). Plaintiff also testified that N.T.C.B. had friends and interacted okay with them, but that if he disagreed with them or did not get his way then he would get "really upset" and not want to be around anybody. (Tr. 44–45). Plaintiff also reported N.T.C.B. no longer took his anger out on her, but that he continued to take it out on his sister, though would apologize after his anger passed. (Tr. 42–43). Plaintiff stated that N.T.C.B. also usually threw fits a couple of times per day, and during these fits he became negative, screamed, and punched things. (Tr. 45).

Plaintiff further stated that N.T.C.B. had never been suspended at school, but he did get written up once for his behavior. (Tr. 43). Plaintiff stated that N.T.C.B. also once got "really angry," and said some "really aggressive and negative stuff" to a classmate who cut him in line. (*Id.*). Finally, Plaintiff also indicated that when N.T.C.B. became excited he would often "blurt[ ] out" answers in class rather than raise his hand, and that when he was excited it was often difficult to understand his speech. (Tr. 46–47).

## III. DISCUSSION

### A. Standard of Review

■ This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to

the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

■ Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46–47 (2d Cir.1996).

Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988).

### B. Standard for Disabled Child's SSI Benefits

Under the Social Security Act, an individual under the age of 18 is considered disabled and thus entitled to SSI benefits when he or she has a "medically determinable physical or mental impairment which results in marked and severe functional limitations and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). In considering a child's application for Social Security Disability benefits, the ALJ uses a three-step evaluation process to determine whether a child is disabled. 20 C.F.R. §§ 416.924(a)-(d). First, the ALJ determines whether the child is engaged in any substantial

gainful activity. 20 C.F.R. § 416.924(b). Second, if the child is not engaged in any substantial gainful activity, the ALJ determines whether the child has a medically severe impairment or combination of impairments that cause "more than a minimal functional limitation." 20 C.F.R. § 416.924(c). Third, the ALJ determines whether the child's severe impairment(s) meets, medically equals, or functionally equals the criteria of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). If the child's impairment(s) medically meets or equals a listed impairment, the child will be found disabled. 20 C.F.R. § 416.926(d)(1).

If a child's impairment(s) does not medically meet or equal a listed impairment, the ALJ will assess all functional limitations caused by the child's impairment(s) to determine if such impairments functionally equal the criteria of any listed impairment. 20 C.F.R. § 416.926a(a). The ALJ considers how a child functions in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A child is classified as disabled if the child's impairment(s) result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. §§ 416.926a(a), (d). "A 'marked' limitation exists when the impairment 'interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities.'" *Hart v. Colvin*, No. 12–CV–1043–JTC, 2014 WL 916747, at *3 (W.D.N.Y. Mar. 10, 2014) (citing 20 C.F.R. § 416.926a(e)(2)(i)) (alteration in original). "An 'extreme' limitation is an impairment which 'interferes very seriously with [the child's] ability to independently initiate, sustain, or complete ac-

tivities." *Id.* (citing 20 C.F.R. § 416.926a(e)(3)(i)) (alteration in original).

## C. Analysis of ALJ's Determination

In the instant case, the ALJ made the following determinations in applying the three-step evaluation process. At the first step, the ALJ determined that N.T.C.B. was a minor at the time the application was filed and that he had not engaged in substantial gainful activity since the application date. (Tr. 17). At the second step, the ALJ found that N.T.C.B. suffered from the severe impairments of ADHD, ODD, and learning disability. (*Id.*). At the third step, the ALJ determined that these impairments did not meet, medically equal, or functionally equal the listings of impairments. (*Id.*).

The ALJ then assessed the functional limitations caused by N.T.C.B.'s impairments and determined that N.T.C.B. had a marked limitation in the domain of acquiring and using information; a less than marked limitation in attending and completing tasks; a less than marked limitation in interacting and relating with others; a less than marked limitation in moving about and manipulating objects; a less than marked limitation in the ability to care for himself; and a less than marked limitation in health and physical well-being. (Tr. 22–26). As a result of these findings, the ALJ concluded that N.T.C.B. was not disabled. (Tr. 26).

Plaintiff contends that the ALJ erred by finding less than marked limitations in the domains of attending and completing tasks and interacting and relating with others.

### 1. Attending and Completing Tasks

#### a. Ms. Bautista

■ Plaintiff contends that the ALJ failed to evaluate the opinion of social worker Ms. Bautista pursuant to the ap-

propriate legal standards. (Dkt. 9–1 at 14). Plaintiff argues that, pursuant to 20 C.F.R. § 416.927, the ALJ failed to accord sufficient weight to the opinion of Ms. Bautista. (*Id.*). The Commissioner argues that Ms. Bautista's opinions were not those of an acceptable medical source whose opinion can receive controlling weight and that, in addition, Ms. Bautista's opinion was largely unsupported and unexplained in her treatment records. (Dkt. 11–1 at 20–21).

▆ Licensed clinical social workers are not considered acceptable medical sources in 20 C.F.R. § 416.913(a), and their opinions are therefore not entitled to controlling weight. *Piatt v. Colvin,* No. 13–CV–6436 EAW, 80 F.Supp.3d 480, 493, 2015 WL 274180, at *12 (W.D.N.Y. Jan. 22, 2015). The amount of weight to give such opinions is based in part on the examining and treatment relationship, length and frequency of the examinations, the extent of relevant evidence given to support the opinion, and consistency with the record as a whole. 20 C.F.R. § 416.927(c). However, the ALJ is "free to decide that the opinions of 'other sources' . . . are entitled to no weight or little weight, [though] those decisions should be explained." *Oaks v. Colvin,* No. 13–CV–917–JTC, 2014 WL 5782486, at *8 (W.D.N.Y. Nov. 6, 2014) (quoting *Sears v. Astrue,* No. 2:11–CV–138, 2012 WL 1758843, at *3 (D.Vt. May 15, 2012)).

Here, as required, the ALJ considered the opinion of Ms. Bautista using the factors outlined above, and credited her opinion little weight. (Dkt. 1–1 at 6). Ms. Bautista's opinion was inconsistent and unsupported by her own treatment records. Ms. Bautista's mental status examination on July 22, 2011 marked N.T.C.B. as having a cooperative attitude, focused thought form, and appropriate affect. (Tr. 347). These notes are not consistent with her overall assessment of N.T.C.B., and her conclusions appear to be more of a reflection of the subjective statements given by Ms. Conlin rather than any clinical evaluation. (Dkt. 1–1 at 7). Moreover, Ms. Bautista's opinion was inconsistent with other findings in the record. Specifically, N.T.C.B.'s academic achievement testing was within average for all areas except for short term memory. (Tr. 431). In addition, while N.T.C.B.'s teachers noted his struggles in reading, math, and writing, they also commented that he had been improving recently. (Tr. 462, 464).

Given these findings, the Court determines that the ALJ did not commit legal error in according the opinion of Ms. Bautista little weight.

### b. Ms. Granbois

Plaintiff next contends that the ALJ erred in crediting the opinion of N.T.C.B.'s teacher, Ms. Granbois, no weight, as the author was not identified. (Dkt. 9–1 at 14). Plaintiff argues that since the school nurse Ms. Wilson did sign the form, and the author described herself as the teacher for the 2010–2011 school year, that it could not have been filled out by anyone but Ms. Granbois. (*Id.* at 16–17 n. 4). Irrespective of this, even if the report signed by Ms. Wilson had been considered by the ALJ, Mr. Bittner's, Dr. Randall's, and Dr. Raja's reports more than adequately support the ALJ's decision. Therefore, any legal error that may have been committed would have likely had no impact on the ALJ's decision, which was supported by substantial evidence.

▆ Although the teacher questionnaire was most likely filled out by the school teacher Ms. Granbois, or at the very least endorsed by the school nurse Ms. Wilson, either of these individuals would be considered an "other source." 20 C.F.R. § 416.913(d). It is well established

that teacher questionnaires are considered valid "other source" opinions. *See Hart,* 2014 WL 916747, at *5; *Spruill ex rel. J.T. v. Astrue,* No. 6:12–CV–6060 (MAT), 2013 WL 885739, at *7 (W.D.N.Y. Mar. 8, 2013). In a social security disability case, the ALJ is entitled to assign little or no weight to "other source" opinions. *Piatt,* 2015 WL 274180, at *12. Furthermore, the ALJ has full discretion to determine the appropriate weight to accord the opinion of an "other source" based on all the evidence before him. *Banks v. Astrue,* 955 F.Supp.2d 178, 189 (W.D.N.Y.2013) (*citing Diaz v. Shalala,* 59 F.3d 307, 314 (2d Cir. 1995)). And while it is true that opinions from other sources are "important and should be evaluated on key issues such as impairment severity and functional effects," SSR 06–03p, 2006 WL 2329939, at *3 (Aug. 9, 2006), even if such weight had been accorded by the ALJ it likely would not have altered his determination.

▉ Here, there is substantial evidence in the record supporting the ALJ's determination. In his November 7, 2011 observation, school counselor Mr. Bittner noted that N.T.C.B. responded well to the teacher and changes in routine, raised his hand in response to the teacher, and was prepared for class. (Tr. 423). It was also noted that N.T.C.B. sat quietly during the observation, did not distract himself or others, worked diligently on assignments, and participated well. (*Id.*). Further, while N.T.C.B. did require occasional feedback to correct behavior, it was "not more than the average student." (Tr. 424). Additionally, school psychologist Ms. Meisch noted that N.T.C.B's standardized test scores were within the average range in all areas of academics, and Ms. Granbois indicated in her most recent progress report that N.T.C.B. continued to show improvement in following rules and completing new tasks. (Tr. 382, 459).

▉ Moreover, the State Agency medical expert report of Dr. Randall also concluded that N.T.C.B. had less than marked limitations in the domain of attending and completing tasks. (Tr. 311). The ALJ accorded great weight to this opinion. (Tr. 20). "It is well settled that an ALJ is entitled to rely upon the opinions of the State Agency's medical and psychological consultants, since they are qualified experts in the field of Social Security disability." *Karlsson–Hammitt v. Colvin,* No. 13–CV–916S, 2014 WL 5500663, at *3 (W.D.N.Y.2014). As qualified experts in the evaluation of medical issues in social security disability claims, State Agency physicians' opinions may constitute substantial evidence, *Babcock v. Barnhart,* 412 F.Supp.2d 274, 280 (W.D.N.Y.2006), and may be relied upon if they are consistent with the record as a whole, *Frye ex rel. A.O. v. Astrue,* 485 Fed.Appx. 484, 487 (2d Cir.2012). As a medical consultant with the Social Security Administration, Dr. Randall is well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act, and the ALJ decision specifically noted the detailed explanations of the evidence he used to base his opinions. (Tr. 20).

▉ While medical source opinions that are "conclusory, stale, and based on an incomplete medical record" may not be substantial evidence to support an ALJ finding, *Griffith v. Astrue,* No. 08–CV–6004, 2009 WL 909630, at *9 n. 9 (W.D.N.Y. March 31, 2009), this is not true where such opinions are supported by substantially similar findings in treatment notes and other opinions in the record, *Camille v. Colvin,* No. 14–CV–6155 EAW, 104 F.Supp.3d 329, 343–44, 2015 WL 2381030, at *13 (W.D.N.Y. May 19, 2015). In this case, Dr. Randall's opinion was consistent with the evidence discussed

above. (Tr. 20). Further, although Plaintiff points out that Dr. Randall's opinion was not expressly mentioned in the context of attending and completing tasks, the ALJ is not required to mention every piece of evidence considered in making a decision. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir.1983) ("[The court] do[es] not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion...."). Thus, remand is not appropriate where we are able to look to other portions of the ALJ's decision to find clearly credible evidence supporting the ALJ's rationale and conclude that his decision was supported by substantial evidence. *Id.* (*citing Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

Finally, while Plaintiff correctly asserts that the opinion from a "non-medical source" may outweigh the opinion from a medical source if the "non-medical source" has seen the individual more often, has greater knowledge of the individual's functioning over time, and if the "non-medical source's" opinion has better supporting evidence and is more consistent with the evidence as a whole, these criteria are not met by the specific facts of this case. SSR 06–03p, 2006 WL 2329939, at *3. Remand is therefore not appropriate, as there is substantial evidence in the record, including the reports of Dr. Randall and Mr. Bittner, to support the ALJ's determination, and the ALJ did not err in applying the proper legal standard for evaluating these opinions.

### c. Dr. Raja

▇▇▇▇ Plaintiff next argues that the ALJ erred by crediting some of Dr. Raja's findings while ignoring other significant deficits the doctor identified, and by selectively adopting only the least supportive portions of the medical source's statements. (Dkt. 9–1 at 14). While the ALJ is not obligated in a social security disability benefits case to explicitly reconcile every conflicting shred of medical testimony, he or she cannot simply selectively choose evidence in the record that supports his or her conclusions. *Dioguardi v. Comm'r of Soc. Sec.*, 445 F.Supp.2d 288 (W.D.N.Y. 2006). While it is true that "[a] claimant is entitled to an express recognition of a favorable medical source statement and an ALJ's reasons for not accepting it," *Feliciano v. Colvin*, No. 12–CV–1251S, 2014 WL 2945776, at *3 (W.D.N.Y. June 30, 2014), an ALJ is not required to discuss every piece of evidence where the rationale for his decision can be gleamed from the record, *see Mongeur*, 722 F.2d at 1040.

Here, the ALJ specifically considered the findings of Dr. Raja's report that Plaintiff points out in her motion, and accordingly credited it little weight due to the inconsistency of the findings as well as the reliance on Plaintiff's subjective reports. (Tr. 18–19). For example, while Plaintiff reported to Dr. Raja that her son did not listen to her, threw temper tantrums, and told her "you are not my boss," Dr. Raja found N.T.C.B. verbal and easy to engage, with organized thoughts and average cognitive skills. (Tr. 220–21). Furthermore, Dr. Raja's own notes found N.T.C.B to have clear speech with good volume and rhythm, neutral psychomotor activity, and no evidence of gross excessive motor activity, fidgetiness, tics, or involuntary movements. (*Id.*).

▇▇▇▇ It is not error for the ALJ to consider inconsistencies in the notes and opinions of a medical source when that source's opinion is also inconsistent with other medical sources in the record. *Camille*, 104 F.Supp.3d at 341–42, 2015 WL 2381030, at *10 (*quoting Vanterpool v. Colvin*, No. 12–CV–8789(VEC)(SN), 2014 WL

1979925, at *16 (S.D.N.Y. May 15, 2014)). Given this particular administrative record and the circumstances of this case, including the findings of the State agency medical expert Dr. Randall, the ALJ did not err when he assigned little weight to some of the opinions of Dr. Raja. Furthermore, since the ALJ's decision was supported by substantial evidence, there is no reason to disturb his determination. *Perez*, 77 F.3d at 46–47.

### 2. Interacting and Relating With Others

 Plaintiff also contends that the ALJ erred in finding a less than marked limitation in the domain interacting and relating with others. (Dkt. 9–1 at 10). However, Plaintiff provides no support for this argument.

The ALJ explicitly gave great weight to Dr. Randall's opinion that N.T.C.B. had a less than marked limitation in the domain interacting and relating with others. (Tr. 23). This opinion was also consistent with other evidence found in the record. N.T.C.B's IEP noted that he enjoyed communicating with his peers and adults. (Tr. 451). His teacher described him as a nice friend and caring toward his teachers (Tr. 459), and Dr. Raja also noted that N.T.C.B.'s mother stated he had "no difficulty making friends" (Tr. 219).

Considered together, the Court finds that this evidence constitutes substantial evidence to support the ALJ's determination that N.T.C.B. had a less than marked determination in the domain of interacting and relating with others.

## IV. CONCLUSION

The Court has considered Plaintiff's remaining arguments and finds them to be without merit. For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the mean-ing of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and Plaintiffs motion for judgment on the pleadings (Dkt. 9) is denied. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.